# United States Court of Appeals for the Federal Circuit

04-1268,-1416

SAAB CARS USA, INC.,

Plaintiff-Appellant,

v.

UNITED STATES,

Defendant-Cross Appellant.


Judith A. Lee, Gibson, Dunn, & Crutcher LLP, of Washington, DC, argued for plaintiff-appellant.  Of counsel was Michael K. Stransky.

Barbara S. Williams, Attorney in Charge, International Field Office, Commercial Litigation Branch, Civil Division, United States Department of Justice, of New York, New York, argued for defendant-cross appellant.  With her on the brief were Peter D. Keisler, Assistant Attorney General and David M. Cohen, Director, Commercial Litigation Branch, Civil Division, of Washington, DC.  Of counsel was Yelena Slepak, Attorney, Office of Assistant Chief Counsel, United States Customs Service, of New York, New York.

Thomas J. Kovarcik, of New York, New York, for amicus curiae Volkswagen of America, Inc.

Appealed from:  United States Court of International Trade

Senior Judge Richard W. Goldberg

# United States Court of Appeals for the Federal Circuit

04-1268, -1416

SAAB CARS USA, INC.,

Plaintiff-Appellant,

v.

UNITED STATES,

Defendant-Cross Appellant.

—————————————

DECIDED:  January 17, 2006

—————————————

Before SCHALL, GAJARSA, and PROST, Circuit Judges.

GAJARSA, Circuit Judge.

Saab Cars USA, Inc. ("Saab" or "appellant") appeals from two judgments of the Court of International Trade ("CIT") affirming, in part, decisions of the United States Customs Service ("Customs") denying Saab's protest of decisions denying duty allowances for defective imported automobiles.  The first, issued July 14, 2003, denied both parties' summary judgment motions.  Saab Cars USA, Inc. v. United States, 276 F. Supp. 2d 1322 (Ct. Int'l Trade 2003) ("Saab I").  The second, issued January 6, 2004, following a hearing held in lieu of trial, granted Saab partial relief but rejected most of its claims.  Saab Cars USA, Inc. v. United States, 306 F. Supp. 2d 1279 (Ct. Int'l Trade 2004) ("Saab II").  The CIT entered final judgment on April 30, 2004, and Saab filed its

notice of appeal the same day. We have jurisdiction pursuant to 28 U.S.C. § 1295(a)(5). For the reasons set forth below, we affirm.

BACKGROUND

Saab imports and distributes automobiles from its Swedish parent company, Saab Automobile AB ("Saab Sweden"). This action arises from Customs' treatment of automobiles imported by Saab that allegedly contained "latent defects." Saab filed protests with Customs seeking an allowance against import duties for the value of those automobiles pursuant to 19 C.F.R. § 158.12, which permits importers to receive such an allowance for "merchandise . . . found by the port director to be partially damaged at the time of importation." 19 C.F.R. § 158.12 (2005). Customs denied the protests on August 9, 1999, after which Saab filed this action.

Saab purchased the vehicles at issue from Saab Sweden in 1996 and 1997. Upon their importation, the company believed that the cars were "free of defects," and therefore "declared as the transaction value of the automobiles the price it paid" to Saab Sweden. Some defects were identified at the place of importation, and were repaired while still in port. Those repairs are referred to as "port repair expenses." Other defects were allegedly discovered only later, after the cars had been shipped to Saab dealers but before the expiration of the warranty agreement that applied between Saab and Saab Sweden. These defects were repaired at the dealer level, and the costs of those repairs are referred to as "warranty expenses."

At the heart of this matter are Saab's protests, which Saab filed with Customs on June 30, 1998, September 14, 1998, January 12, 1999, and March 26, 1999. The

protests involved both port repair expenses and warranty expenses. Each protest included the following text:

> We protest the appraised value of automobiles contained in the entries set forth in Attachment A.
>
> The automobiles listed in these entries were purchased by [Saab] from Saab Automobile AB. [Saab] ordered perfect merchandise from Saab Automobile AB. Despite this order, some of the vehicles delivered contained latent manufacturing defects at the time of importation. Section 158.12 of the Customs Regulations, 19 C.F.R. 158.12, provides that 'merchandise which is subject to ad valorum or compound duties and found by the port director to be partially damaged at the time of importation shall be appraised in its condition as imported, with an allowance made in the value to the extent of the damage.' See Samsung Electronics America, Inc. v. United States, 106 F.3d 376 (Fed. Cir. 1997).
>
> Therefore, pursuant to 19 C.F.R. § 158.12, an allowance in the value of the imported vehicles set forth in the protested entries should have been made to the *[sic]* reflect the extent of the defects. We hereby request that the protested entries be reliquidated and that the vehicles set forth therein be appraised in the condition as imported. In addition, we request that Customs delay its consideration of this protest until the Court of International Trade . . . has issued its decision on remand in the Samsung case. Based on instructions from the Court of Appeals, the anticipated CIT decision will clarify how the § 158.12 allowance will be implemented.

Saab I, 276 F. Supp. 2d at 1325-26.

Each protest attached a list of the entry numbers that were being protested and identified the decision with respect to which the protest was made. Id. at 1328. Each attachment listed entry numbers "for entries of both defective and non-defective vehicles." Id. The attachments listed the following information for each vehicle: protest number, entry number, ship number, Vehicle Identification Number ("VIN"), dealer, claim number, repair date, object code, description of the repair, and total amount paid. Each entry took the following form:

04-1268, -1416                                    3

| Protest # | Entry # | VIN | Dealer | Claim # | Repair Date | Object Code | | Description | Total Paid |
|---|---|---|---|---|---|---|---|---|---|
| 0502-989-100041 | 9801057-7 | T1028095 | 7997 | 5199072 | 960613 | 35183 | | Door light, front door | 11 |

Customs denied Saab's protests on August 9, 1999, upon which Saab appealed to the CIT.

In the CIT, Saab moved for summary judgment on its claim for a partial refund of duties on the allegedly defective automobiles. The United States filed a cross-motion for summary judgment seeking dismissal of the action for lack of jurisdiction, on the ground that Saab's protests were insufficiently detailed and therefore invalid. Id. at 1324. In an opinion dated July 14, 2003, the trial court denied both motions, concluding that (a) Saab's protests provided sufficient details about its claim to render the protests valid under 19 U.S.C. § 1514(c) (2000), thereby vesting the CIT with jurisdiction, and (b) Saab had not provided adequate evidence to overcome Customs' denials of its protests, such that "factual questions remain[ed] regarding whether the defects existed at the time of importation." Id. at 1326-30. With respect to Saab's claims, the trial court indicated that "[w]hat remains for trial is to develop the factual record to independently confirm the validity of the repair records in order to establish that the defects did indeed exist at the time of importation." Id. at 1333 (internal quotations omitted). The court also ruled that it lacked jurisdiction over any cars "that were repaired after the date [Saab] filed its protest with Customs." Id. at 1329.

Following the CIT's summary judgment ruling, "[t]he parties agreed, in lieu of trial, to submit a factual stipulation to the Court." Saab II, 306 F. Supp. 2d at 1280. The trial court then held a hearing at which both parties presented arguments based upon the stipulated facts. Id. On January 6, 2004, the CIT issued an opinion rejecting all of

Saab's claims except the claims for an allowance for port repair expenses and a single claim for an allowance for warranty expenses. Id.

In rejecting all but a fraction of Saab's allowance claims, the CIT applied the analysis used by this court and by the CIT in a series of cases involving Samsung Electronics. See Samsung Elecs. Am. v. United States, 106 F.3d 376 (Fed. Cir. 1997) ("Samsung II"); Samsung Elecs. Am. v. United States, 35 F. Supp. 2d 942 (Ct. Int'l Trade 1999) ("Samsung III"); and Samsung Elecs. Am. v. United States, 195 F.3d 1367 (Fed. Cir. 1999) ("Samsung IV"). Those cases set forth three requirements for an importer successfully to claim an allowance under 19 C.F.R. § 158.12. Such an importer must: (1) show that it contracted for "defect-free" merchandise; (2) link the defective merchandise to specific entries; and (3) prove the amount of the allowance for each entry.[1] Samsung II, 106 F.3d at 379-80; Samsung IV, 195 F.3d at 1368-69.

In its summary judgment opinion, the CIT found that Saab easily satisfied the first requirement and raised questions of material fact with respect to the latter two. Saab I, 276 F. Supp. 2d at 1332-33. In its opinion following the hearing in lieu of trial, the CIT characterized the remaining question before it as "[w]hat type of evidence is sufficient to satisfy Samsung's instruction that, to prevail on a § 158.12 claim, an importer must proffer 'objective and verifiable evidence with some semblance of specificity?'" Saab II, 306 F. Supp. 2d at 1283 (quoting Samsung III, 35 F. Supp. 2d at 947).

---

[1] In some cases, of course, one or more of these factors may be readily inferred from the relevant facts and circumstances, and not require affirmative proof. See, e.g., Fabil Mfg. v. United States, 237 F.3d 1335, 1339 (Fed. Cir. 2001) (holding that an importer need not affirmatively demonstrate linkage between specific entries and defective merchandise where the importer alleged that all merchandise in the covered entries was defective.).

In addressing that question, the CIT reviewed in detail the evidence proffered by Saab, which included: (1) the attachments described above, which included entry numbers, claim numbers, repair descriptions, and VINs; (2) documentation of the warranty agreement between Saab and Saab Sweden, which allegedly specified that Saab Sweden would pay Saab only for vehicles that were defective at importation; and (3) sample "computer claim forms" for ten vehicles that included additional information, such as vehicle mileage as of the date of repair, the repair date, and additional details about the nature of the defect. See Saab II, 306 F. Supp. 2d at 1283-84. Saab declined to provide similar forms for all vehicles because of the "prohibitive cost" of doing so. Id. at 1284.

Based upon the evidence presented, the CIT concluded that, with respect to the claim for warranty expenses, Saab had failed to satisfy its burden on factors two and three of the Samsung analysis. With respect to factor two—the requirement that the importer be able to link the defective merchandise to specific entries—the court found that Saab failed to "describe[] its defective merchandise with sufficient specificity," because the computer printout it provided did not "indicate[] how the component was defective, or what type of repair was performed." Id. The court ruled that the descriptions provided by Saab with respect to most of its claims were "not detailed enough for anyone to ascertain whether the alleged defects existed at the time of importation." Id. at 1285. The court did allow Saab's warranty expense claims with respect to three vehicles for which sample computer claim forms were filed. Id. at 1286.

Evaluating essentially the same evidence, however, the court allowed Saab's claim for allowances for its port repair expenses. Because the repairs were made "almost immediately after importation," the court declared that it was "not concerned, as it was with regard to . . . warranty expenses, that the repairs might have been made to remedy damage resulting from intervening circumstances." Id. at 1287. Although the evidence supplied by Saab with respect to the port repairs was substantially identical to the evidence it supplied with respect to the warranty expenses, the court found that the immediacy of the repairs after importation reduced the level of detail required in the defect descriptions to satisfy, by preponderance, the Samsung test. Id. Accordingly, the CIT awarded Saab allowances in the amount of all the claimed expenses for port repairs, less those over which it lacked jurisdiction.

The CIT entered final judgment on April 30, 2004, and Saab filed its notice of appeal the same day. The government cross-appealed those portions of the CIT's decisions that favored Saab.

DISCUSSION

A. Jurisdiction

The United States argues that the CIT lacked subject-matter jurisdiction over Saab's claims. As the CIT itself pointed out, "a prerequisite to [CIT] jurisdiction . . . is the denial of a valid protest." Saab I, 276 F. Supp. 2d at 1326. See also Koike Aronson, Inc. v. United States, 165 F.3d 906, 908 (Fed. Cir. 1999). The government argues that Saab's protests were invalid because they were not "filed in compliance with all statutes and regulations." Specifically, the government alleges that Saab's protests fail to satisfy the requirements of 19 C.F.R. § 174.13(a)(5) and (6), which provide that a

protest shall contain a "specific description of the merchandise affected," and the "nature of, and justification for the objection set forth distinctly and specifically with respect to each category, payment, claim, decision, or refusal."  The government points to what it regards as two critical deficiencies in Saab's protests: (1) their failure to specify the damage suffered by the vehicles at issue beyond the general description "latent defects"; and (2) their inclusion, in the attachments identifying the vehicles governed by each protest, of entries for "both defective and non-defective vehicles." The government cites a series of cases supporting its view that these deficiencies are fatal to the validity of Saab's protests.  See, e.g., Davies v. Arthur, 96 U.S. 148, 151 (1877) (stating that although "[t]echnical precision is not required . . . the objections must be so distinct and specific, as, when fairly construed, to show that the objection taken at the trial was at the time in the mind of the importer, and . . . sufficient to notify the collector of its true nature and character").

Saab responds that its protests were sufficiently detailed to vest the CIT with jurisdiction, citing for its position a series of cases in this court and its predecessors stating that to vest jurisdiction, a protest need only "be sufficiently distinct and specific to enable the Customs Service to know what is in the mind of the protestant." Computime, Inc. v. United States, 772 F.2d 874, 879 (Fed. Cir. 1985) (quotations omitted); see also Mattel, Inc. v. United States, 377 F. Supp. 955, 960 (Cust. Ct. 1974) ("However cryptic, inartistic, or poorly drawn a communication may be, it is sufficient as a protest . . . if it conveys enough information to apprise knowledgeable officials of the importer's intent and the relief sought.").  Applying this standard, Saab argues that its protests "clearly, distinctly, and specifically conveyed to Customs what Saab' [sic] claim was—an

allowance in the appraised value of the subject merchandise under § 158.12—and ground therefore—latent defects therein."

Saab, in short, claims that the appropriate standard in determining validity of protests for CIT jurisdictional purposes is something akin to enhanced notice pleading. The United States argues that significantly more detail is required to satisfy the requirements of 19 U.S.C. § 1514(c) and 19 C.F.R. § 174.13. The trial court, faced with essentially identical arguments, concluded that Saab had met its burden of establishing CIT jurisdiction, because its protests identified (1) the decision protested, (2) the category of merchandise at issue, and (3) the nature of each objection. Saab I, 276 F. Supp. 2d at 1328-29.

We agree with the trial court. The authorities cited by both parties establish the general rule that customs protests are to be construed "generously in favor of finding them valid," but that "a protest is defective if it 'gives no indication of the reasons why the collector's action is alleged to be erroneous, and . . . does not set forth the paragraphs which allegedly properly govern the disposition of the merchandise.'" Koike Aronson, 165 F.3d at 908 (quoting Washington Int'l Ins. Co. v. United States, 16 Ct. Int'l Trade 599, 602 (1992)).

The courts have generally denied the validity of protests on two broad grounds: overbreadth and indefiniteness. It is clear, for example, that a "blanket protest" raising every conceivable ground for protest is overbroad and therefore invalid, because it fails to "apprise[] the collector and the court of real claims as distinguished from possible claims." Lichtenstein v. United States, 1 Ct. Cust. 79, 82 (1910); see also XL Specialty Ins. Co. v. United States, 341 F. Supp. 2d 1251, 1255-56 (Ct. Int'l Trade 2004) (holding

a protest invalid because, <u>inter alia</u>, it "merely listed every possible objection to Customs' liquidation and did not include any reasons to support those objections"). On the other end of the spectrum, a protest is also invalid if it simply alleges, without explanation, that a particular Customs decision is erroneous. <u>See, e.g.</u>, <u>United States v. E.H. Bailey & Co.</u>, 32 C.C.P.A. 89, 98 (1944) (ruling that "[a] protest is not sufficient . . . which alleges merely that the amount of the duties assessed by the collector is erroneous," because "[s]uch a blanket form, if sufficient, could be used in every case"). A protest is insufficiently definite, too, if it fails to identify a basis for protest on which it later relies in the trial court. <u>See, e.g.</u>, <u>Davies v. Arthur</u>, 96 U.S. at 152-53 (affirming lower court's ruling that, at trial, a protester "could only be heard to allege the objections distinctly and specifically stated in their protest").

Here, Saab's protests identified each decision protested by entry number and clearly stated the regulatory basis for its protest—§ 158.12. It was clear from the protests that Saab sought an allowance based upon damage to merchandise that existed at the time of importation; that the protest involved the classification "automobiles"; and that the automobiles in question belonged to identified entry numbers. The only real question is whether Saab's failure to specifically identify the individual vehicles or tie them to individual defects is fatal to the validity of its protest. The trial court concluded that it was not, and we agree. The standard proposed by the United States would, it seems, require Saab to identify, specifically, the alleged defect and its value for each of over 100,000 individual repairs covered by the protests simply to vest the CIT with jurisdiction over the claim. Such a standard conflates the merits of the importer's claim with the court's jurisdiction. The government cites no case, and we

are aware of none, that requires a protest to contain such exhaustive detail and specificity merely to vest the CIT with jurisdiction. We affirm the trial court's denial of the government's summary judgment motion on the issue of its jurisdiction over Saab's protests.

Saab, in turn, appeals the CIT's conclusion, rendered in the course of denying both parties' summary judgment motions, that the court lacked jurisdiction over any "automobiles that were repaired after the date [Saab] filed its protests with Customs." Saab I, 276 F. Supp. 2d at 1329. The trial court, in rendering this portion of its jurisdictional decision, stated that a valid protest "'must show fairly that the objection afterwards made at the trial was in the mind of the party at the time the protest was made.'" Id. (quoting Mattel, 377 F. Supp. at 959). The court reasoned that at the time its protests were filed, Saab "could not have had in mind defects to automobiles that had not [yet] been repaired." Id. The court therefore concluded that it lacked jurisdiction over any automobile listed in any of the protests that had not yet been repaired as of the date the relevant protest was filed. Id.

Appealing that judgment, Saab argues that the trial court, by tying its jurisdiction to evidence of repairs, misapplied the law. The repairs, Saab reasons, are merely evidence of the facts underlying the claimed allowances—namely, the existence of latent defects at the time of importation. As such, they may be relevant to the merits of Saab's claim, but not to the threshold question of jurisdiction; after all, Saab argues, "the nature and amount of supporting evidence available when a protest is filed is irrelevant to whether the protest was filed timely . . . . Even if Saab had submitted no evidence on this issue, the lower court would still have had 'jurisdiction' to hear the claim,

because there was a denial of a timely protest" vesting jurisdiction in the CIT under 28 U.S.C. § 1581(a) (2000).

In a different context, Saab's argument would have considerable force: in general, a mere non-frivolous allegation is sufficient to vest a reviewing court with jurisdiction. But this court has stated expressly that "protests are not 'akin to notice pleadings [that] merely have to set forth factual allegations without providing any underlying reasoning.'" Koike Aronson, 165 F.3d at 909 (quoting Computime, Inc. v. United States, 772 F.2d at 878) (emphasis added)). Instead, a protest "must contain a distinct and clear specification of each substantive ground of objection" so as to "show that the objection taken at the trial was at the time in the mind of the importer." Davies v. Arthur, 96 U.S. at 151, quoted in Koike Aronson, 165 F.3d at 908. The requirement of specificity exists so that the protest is "sufficient to notify the collector of its true nature and character, to the end that he might ascertain the precise facts, and have an opportunity to correct the mistake and cure the defect." Id.

The circumstances presented by the case at bar differ, we admit, from the existing precedents. We are aware of no case addressing the central issue, namely, whether an importer may file a valid protest seeking an allowance under § 158.12 based upon merchandise defects the existence of which he is unaware at the time of protest. We conclude, however, that the construction of § 158.12 proposed by Saab is inconsistent with the spirit of our precedent. We do not understand, for example, how Customs could be in a position "to correct the mistake" when it is uncertain that any mistake has been made. Davies v. Arthur, 96 U.S. at 151.

Were we to adopt Saab's construction of the regulatory scheme, an importer would be able to file blanket protests of the appraisal of all its entries based solely on the probability that some portion of those entries will, in the future, turn out to be defective. The regulation and statute, with their requirement that protests be set forth "distinctly and specifically," do not permit protests to proceed on such nebulous grounds. 19 U.S.C. § 514(c)(1); 19 C.F.R. § 174.13(a)(6). Our requirement that a protest "contain a distinct and clear specification of each substantive ground of objection," so as to "show that the objection taken at the trial was at the time in the mind of the importer," would be wholly ineffective if the specified ground of objection were unmoored to any factual basis for raising it. Thus, Saab's claims regarding cars to which no repairs had been made at the time of protest differ materially from its claims regarding cars with existing repair records: the repairs provide the court with some basis for concluding that Saab in fact had "in mind" the defects repaired when it filed the protest. Without establishing some nexus between its ground for objection and the existence of actual defects, Saab is merely making generic protests of probabilistic damages. We think that the statute and the authorities require more.

We therefore affirm the decision of the CIT dismissing those claims relating to cars as to which no repair existed at the time of protest, because Saab provided no evidence that it was aware of those defects at that time.

### B. Summary Judgment

Saab argues that it was entitled to prevail on its motion for summary judgment as a matter of law, because the government failed to submit any evidence in opposition to that motion. Rule 56(e) of the Rules of the Court of International Trade provides:

When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denial of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party.

Saab cites a series of cases in this court stating the general rule that in responding to a motion for summary judgment, the "non-movant may not rest on its conclusory pleadings but, under Rule 56, must set out . . . what specific evidence could be offered at trial." Sweats Fashions, Inc. v. Pannill Knitting Co., Inc., 833 F.2d 1560, 1562 (Fed. Cir. 1987); see also Crown Operations Int'l, Ltd. v. Solutia Inc., 289 F.3d 1367, 1377 (Fed. Cir. 2002) (stating that the "non-moving party must affirmatively demonstrate by specific factual allegations that a genuine issue of material fact exists for trial"). Based on Rule 56 and these and other authorities, Saab argues that "[b]ecause the Government failed to offer any evidence to rebut the mountain of evidence submitted with Saab's Motion for Summary Judgment, the lower court erred in not granting summary judgment to Saab."

In reply, the United States raises two basic arguments. First, it claims that "Saab's position is frankly inaccurate," because the government "did introduce evidence" to rebut Saab's motion, in the form of a declaration by its expert witness. We reject this argument. The government did not produce the declaration of Mr. Meinschein until September 25, 2003—more than two months after the trial court denied Saab's summary judgment motion.

Second, the government argues that it was not required to produce evidence because "Saab failed to meet its burden of contradicting Customs' presumed correct

04-1268, -1416                    14

factual finding that Saab's merchandise was not damaged at importation." This is an accurate statement of the relevant principles of summary judgment. A non-movant need not always provide affidavits or other evidence to defeat a summary judgment motion. If, for example, the movant bears the burden and its motion fails to satisfy that burden, the non-movant is "not required to come forward" with opposing evidence. Adickes v. S.H. Kress & Co., 398 U.S. 144, 160 (1970) (citing the advisory committee's note to Fed. R. Civ. P. 56(e)). As the leading commentator on federal procedure puts it, "[i]f the motion is brought by a party with the ultimate burden of proof, the movant must still satisfy its burden by showing that it is entitled to judgment as a matter of law even in the absence of an adequate response by the nonmovant." 11 James Wm. Moore et al., Moore's Federal Practice ¶ 56.13[1] (3d ed. 2005).

This principle is consistent with the text of Rule 56(e), which states that "[i]f the adverse party does not respond" with specific evidence, "summary judgment, if appropriate, shall be entered against the adverse party." R. Ct. Int'l Trade 56(e) (emphasis added). Although it appears that this court has never reached this issue directly, its decisions support the principle that a non-movant is required to provide opposing evidence under Rule 56(e) only if the moving party has provided evidence sufficient, if unopposed, to prevail as a matter of law. See, e.g., Sweats Fashions, 833 F.2d at 1562 ("[w]here a movant has supported its motions with affidavits or other evidence which, unopposed, would establish its right to judgment, the non-movant . . . must proffer countering evidence") (emphasis added); Chem. Eng'g Corp. v. Essef Indus., 795 F.2d 1565, 1571 (Fed. Cir. 1990) ("where the movant has also supported its motion with affidavits establishing it is entitled to judgment . . . the non-movant bears a

04-1268, -1416                    15

burden of coming forward with specific facts to show that there is a genuine issue for trial") (emphasis added).

In the summary judgment proceeding, the trial court determined that the evidence provided by Saab left material issues of fact regarding two issues: whether Saab could (1) "establish by a preponderance of the evidence which entries had defects at the time of importation," and (2) make "a showing by a preponderance of the evidence of the amount of the allowances for each entry of the defective vehicles," in each case as required by Samsung III.  Saab I, 276 F. Supp. 2d at 1333.  The trial court, in other words, concluded that Saab's evidentiary showing was inadequate to demonstrate that Saab should prevail as a matter of law.  In such circumstances, the cases are clear that the government was not required to submit opposing evidence.

## C.  Allowances For "Latent Defects"

The United States argues that 19 C.F.R. § 158.12 does not provide relief for latent defects, because the regulation permits allowances only for such merchandise damage as is "discovered or readily discoverable at importation."  Because the allowances claimed by Saab relate to defects that were, in Saab's terms, "latent," the government asserts that they were inherently not "readily discoverable" at the time of importation and therefore not eligible for allowances under § 158.12.

The government's argument derives from the language of the regulation itself, which provides that "[m]erchandise . . . which is found by the port director to be partially damaged at the time of importation shall be appraised in its condition as imported."  19 C.F.R. § 158.12(a).  The government reads this language to require "that the port director must be able to identify the damage 'at the time of importation.'"

04-1268, -1416                    16

The trial court found the government's argument in this regard to be "anemic" and "advanced purely for litigation," and therefore declined to give any deference to "Customs' purported interpretation" of § 152.12. Saab I, 276 F. Supp. 2d at 1331. It then reviewed the language of the regulation itself, concluding that the plain language of the provision limits allowances not to damage "ascertainable to the port director at the time of importation," but to "goods partially damaged when imported, whenever that damage is discovered." Id. at 1331-32.

We agree. The government's interpretation is unduly restrictive. The better reading is that the words "at the time of importation" modify the phrase "partially damaged," not the verb "found." Read thus, the regulation permits allowances for merchandise that the port director finds, at any time, to have been partially damaged at the time of importation. The government's interpretation would lead to absurdity: because "importation" occurs in a "moment," United States v. Arnold Pickle & Olive Co., 659 F.2d 1049, 1053 (C.C.P.A. 1981), a requirement that defects be identified at the "time of importation" would preclude recovery for any defects not identifiable at a single glance. The government disclaims that literalist interpretation, as it must, and attempts to substitute a standard in which damage "at the time of importation" means damage "which is not readily apparent at importation, but discoverable through minimal inspection within a brief period after importation."

The government's interpretation of the regulation finds support neither in its plain language nor in our cases. The sole authority cited to support the interpretation, G. Cuccio Di G. & Co. v. United States, 172 F. 304 (C.C.S.D.N.Y. 1909), is less than persuasive. G. Cuccio involved a protest over the appraisal of lemons. The fruit arrived

at the port of entry but was not examined for six days thereafter, by which time "[m]uch loss by rotting" had occurred. 172 F. at 304. The court recited the general principle that "the duty attaches to the goods immediately upon their arrival within the limits of our ports," and affirmed the assessment of duty as of the date of entry, concluding that "it would be a dangerous precedent to say that the loss discovered at the examination should serve as the basis of determining the condition of the fruit a week earlier." Id. G. Cuccio stands for no proposition broader than the obvious one that in the absence of evidence that the merchandise in question was defective at the time of entry, it will be assessed as if it were not. It does not support the government's argument here.

The rulemaking history of § 158.12 also undermines the government's argument. It states that "[s]ection 158.12 . . . has been added to show the treatment given to merchandise which is partially damaged . . . at the time of importation." Proposed Rule Making, 37 Fed. Reg. 7797 (April 20, 1972) (emphasis added). The proposed rulemaking describes the purposes of § 158.12 in terms of damage at the time of entry; it makes no reference to when the damage is actually discovered.

The United States also argues that its interpretation of § 158.12 is supported by 19 U.S.C. § 1313(c), which provides for refunds of duties paid on merchandise "not conforming to sample or specifications" or "determined to be defective as of the time of importation," which, "within 3 years after the date of importation . . . has been exported or destroyed under the supervision of the Customs Service." 19 U.S.C. § 1313(c)(1). The government argues that Congress intended this section to deal with latent defects like those at issue here, quoting legislative history to the effect that the purpose of § 1313(c) "was to extend the time for return to customs custody to a period reasonably

adequate for discovery of latent defects or those which can only be ascertained by test or use" (internal quotations omitted).

Saab failed to respond to this argument in its reply brief. Nevertheless, we find it unconvincing. By its terms, § 1313(c) applies only to nonconforming or defective merchandise that, following importation, is re-exported or destroyed by the Customs Service. The drawback amount in each case is 99% of the duty originally paid. Section 1514(c) and its implementing regulations, by contrast, address a different circumstance, one that does not require the subsequent exportation or destruction of the defective merchandise and does not necessarily provide complete recovery of the duties paid. We agree with the trial court that "[t]he plain language of §1313(c) does not include under its purview all instances of defects discovered after importation, and thus does not preclude §158.12 from applying in the present case." Saab I, 276 F. Supp. 2d at 1332.

In short, the government's interpretation of § 158.12 finds support neither in the plain text of the regulation, nor in precedent, nor in the rulemaking history of the provision, nor in the structure of the Tariff Act itself. We therefore affirm the trial court's conclusion that § 158.12, by its terms, permits allowances for "goods partially damaged when imported, whenever that damage is discovered." Id. at 1331-32.

### D. Sufficiency Of Evidence

In rendering its second judgment, the trial court followed a procedure, used "in lieu of trial," in which the court conducted a hearing based upon a factual stipulation submitted by the parties. Saab II, 306 F. Supp. 2d at 1280. The United States apparently believes that we review such a decision as if it were a summary judgment,

"de novo . . . for correctness as a matter of law." Saab suggests the standard of review applicable to a judgment following trial on the merits, in which we review question of law de novo and questions of fact for clear error.

The correct standard of review for a judgment issued on stipulated facts in lieu of trial appears to be a question of first impression in this circuit.[2] Our sister circuits have addressed the issue on several occasions. Some courts have simply applied the standard for summary judgment review. See, e.g., More v. Intelcom Support Servs., 960 F.2d 466, 469 (5th Cir. 1992) ("As this was a trial on stipulated facts, we review it as we would a summary judgment."). Others, however, have concluded that a trial based on stipulated facts "is more akin to a bench trial than to a summary judgment ruling," such that the appellate court should "review the district court's legal conclusions de novo and review any factual inferences the district court made from the stipulated record as well as its application of the law to the facts for clear error." Hess v. Hartford Life & Accident Ins. Co., 274 F.3d 456, 461 (1st Cir. 2001) (citations omitted); see also Reich v. John Alden Life Ins. Co., 126 F.3d 1, 6-7 (1st Cir. 1997) (holding that, where parties submitted case to trial court on stipulated facts, the appeal "involves both factual and legal determinations," such that the appellate court "will apply the more deferential clear-error standard when reviewing the factual inferences drawn by the court below . . . while the lower court's ultimate application of the law to the facts, both those stated and inferred, remains subject to de novo review"); Garcia-Ayala v. Lederle Parenterals, Inc.,

---

[2] Although this court has used de novo review to resolve cases involving a summary judgment on stipulated facts, see, e.g., Air Pegasus of D.C., Inc., v. United States, 424 F.3d 1206, 1210 (Fed. Cir. 2005), it has never directly addressed the substance of this issue. In addition, we note that the trial court here did not characterize its decision as a summary judgment, but as a proceeding "in lieu of trial."

212 F.3d 638, 643-44 (1st Cir. 2000) (applying clear-error review to judgment rendered on cross-motions for summary judgment on stipulated facts); Starsky v. Williams, 512 F.2d 109, 111 (9th Cir. 1975) (applying clear-error review to trial court's findings in case where "the parties had in effect submitted [the] case to the court for trial on an agreed statement of facts"); Vetter v. Frosch, 599 F.2d 630, 632 (9th Cir. 1979) (citing Starsky v. Williams).

We believe that the First and Ninth Circuits have stated the correct rule. Summary judgment and judgment on stipulated facts are not identical; they differ, in particular, in the role that presumptions and burden-shifting play in the court's decisionmaking. In rendering judgment based upon stipulated facts, the trial judge of necessity draws—and bases legal conclusions on—factual inferences that would be impermissible in the summary judgment context under Rule 56. A trial court's decision based upon stipulated facts resembles, in significant respects, a decision on the administrative record, which we have recently concluded is not akin to summary judgment. See Bannum, Inc. v. United States, 404 F.3d 1346, 1353-57 (Fed. Cir. 2005).[3] We conclude, therefore, that we review the trial court's legal conclusions de novo. We review inferences it drew from the stipulated facts, and its application of the law to those facts, for clear error.

The trial court ruled that Saab provided evidence insufficient to demonstrate its entitlement to allowances for over-appraisals of damaged merchandise with respect to some portions of its claims. Saab II, 306 F. Supp. 2d at 1288. Both parties appeal that

---

[3]  Bannum involved the Rule 56.1 of the Rules of the Court of Federal Claims, which we have described as a "counterpart" to Rule 56.1 of the Rules of the Court of International Trade. See Bannum, 404 F.3d at 1355 n.6.

ruling on multiple grounds. Saab claims that, in so ruling, the trial court failed to consider all the evidence. This is a question of applying law to the facts, which we may reverse only if the trial court's decision was "clearly erroneous." See, e.g., Shockley v. Arcan, Inc., 248 F.3d 1349, 1357 (Fed. Cir. 2001). That is, we may overturn the trial court only if we have a "definite and firm conviction that a mistake has been committed." United States v. U.S. Gypsum Co., 333 U.S. 364, 395 (1948).

No error occurred here. In its brief, Saab lists seven types of evidence submitted to the trial court. Of those seven, four deal entirely with the warranty agreement between Saab and Saab Sweden. Contrary to Saab's assertions, the trial court clearly considered the significance of that agreement in finding that Saab had met the first element of the Samsung three-part test. See Saab I, 276 F. Supp. 2d at 1324 (describing the terms of the warranty and citing to the relevant trial exhibit); id. at 1332-33 (concluding that Saab contracted for "defect-free" merchandise); Saab II, 306 F. Supp. 2d at 1280 (citing to the trial exhibit containing the warranty agreement). The trial court also expressly considered the computer printouts of warranty repairs and the sample "computer claim forms." Saab II, 306 F. Supp. 2d at 1282. Even a cursory examination of the trial court's opinion establishes that the trial court properly considered the evidence before it. Saab's argument in this regard is without merit.

The United States argues that the trial court erred in determining that Saab met its burden of proof with respect to its claims for allowances based upon port repair expenses. The government asserts that the trial court erroneously applied a "lesser standard of proof" for claims based upon port repair records, and that the evidence relied upon by the trial court in making its determination—the warranty agreements and

the computer printouts of repair expenses—were insufficient to meet Saab's burden of proof under the Samsung cases. The government also claims that the trial court's "assumptions that the port repairs occurred shortly after importation," and that this "alleged proximity in time suggests that port repair expenses reflect damage existing at the time of importation," are unsupported by the evidence.

We agree that the correct standard of proof for both warranty-based claims and port repair-based claims is the same: preponderance of the evidence. Fabil Mfg. v. United States, 237 F.3d 1335, 1339 (Fed. Cir. 2001) (holding that the standard of proof in duty allowance cases is preponderance of the evidence). The government's assertion that the trial court applied a lesser standard of proof for Saab's port repair expense claims is not well founded. The trial court's statement that Saab "is not required to provide defect descriptions with the same degree of specificity as those required for its warranty expenses," Saab II, 306 F. Supp. 2d at 1287, merely expresses the trial court's conclusion that because the port repairs were undertaken during or shortly after the time of importation, they are highly probative of the condition of the merchandise at the relevant time. It is not an expression of a reduced standard of proof in support of the damages. The trial court correctly applied the preponderance standard to all Saab's claims.

The trial court concluded that the warranty repair evidence, plus the additional evidence provided by the temporal proximity of the port repairs to the time of importation, was sufficient to demonstrate by preponderance that the damages evidenced by port repair expenses existed at the time of importation. Saab II, 306 F. Supp. 2d at 1287. The government claims that the combination of those two pieces of

evidence was still inadequate; Saab claims that warranty repair evidence alone should have been sufficient. The question before us is who, if anyone, is correct.

In Samsung III, the CIT specifically rejected Samsung's claim that its warranty claim records were sufficient to meet its burden of proof:

> In lieu of specific descriptions or samples to illustrate damage at the time of importation, Samsung presents the consumer warranty for the subject merchandise as its principle [sic] evidence that entries contained defective merchandise at the time of importation. . . .
>
> The Court is unpersuaded that Samsung's evidence establishes . . . which subject entries had latent defects at the time of importation.

Samsung III, 35 F. Supp. 2d at 947.

Saab has presented stronger evidence than did Samsung. Its two extensive spreadsheets—one documenting port repair expenses, the other warranty expenses—accomplish one critical task that Samsung could not, namely, linking the allegedly defective merchandise to specific entries. The spreadsheets also speak to another element of the Samsung analysis, by assigning a value to each repair, which in turn is linked to an individual entry. The trial court concluded that Saab's evidence with respect to the warranty expenses was nevertheless insufficient because it failed to "describe its defective merchandise with sufficient specificity." Saab II, 306 F. Supp. 2d at 1284. The defect descriptions on the repair spreadsheets—which generally included a one- to four-word description of the part that was repaired, but not the nature of the repair—were "not detailed enough for anyone to ascertain whether the alleged defects existed at the time of importation." Id. at 1285 (emphasis added). Regarding the port repair expense claims, the court concluded that the proximity of the repairs to the time of importation provided critically probative evidence that the defects in question actually

existed at importation. Id. at 1287. In the absence of such additional evidence, it denied Saab's warranty expense claims.

We agree with the trial court's analysis of Saab's claims for allowances based upon evidence of port repair expenses. As the CIT stated in Samsung III, "[e]vidence provided in reappraisal cases, such as a 19 C.F.R. §158.12 claim, is of greater weight when gathered contemporaneous [sic] with importation, and less so when time has passed between importation and protest." Samsung III, 35 F. Supp. 2d at 947; see also Parmentier's Roses v. United States, 39 Cust. Ct. 170, 173 (1957) (stating that, in appraising the value of merchandise as of the time of importation, remoteness of evidence goes to the weight of the evidence). The trial court correctly concluded that the proximity of the port repairs to the time of importation, together with the other evidence provided by Saab, was sufficient to establish that the defects in question existed at the time of importation.

We must next decide whether, in the absence of that additional evidence of temporal proximity, Saab's proffered evidence—in essence, various evidence about the warranty and the warranty repair spreadsheet—was sufficient to sustain its burden by the preponderance standard. We admit that this is a close question. The warranty agreement between Saab and Saab Sweden comprises five separate warranties: a "pre-warranty," a "new car warranty," an "emissions warranty," a "perforation warranty," and a "parts warranty." Each provides warranty protection for a different set of circumstances. Saab characterizes these individual warranties as making it "clear that Saab would be reimbursed by Saab [Sweden] only for actual manufacturing or design defects in the imported automobiles." This is not entirely accurate; and even if it were

entirely accurate, it is not clear that all warranty repairs necessarily indicate damage that existed "at the time of importation," as required for an allowance under § 158.12.

We note, for example, that the perforation warranty applies to body rust that occurs "during the course of normal usage." We take this to mean that the warranty would apply to a car that developed rust, say, a year after importation, despite being imported in pristine condition. The new car warranty covers "all genuine parts and accessories approved by Saab [Sweden] that are ordered by a customer . . . and fitted to the car upon the first delivery to the customer." It thus would seem to apply to optional equipment installed at the dealer to a car that was undamaged at the time of importation. Not all warranty repairs, therefore, necessarily indicate damage that existed at the time of importation.

In addition, there is the difficult question of whether Saab's conclusion that a particular repair derived from "faulty materials or manufacture" necessarily requires that the car needing repair was "damaged" at the time of importation. If the brakes on a new Saab fail during the warranty period—say, in the second year after sale to a customer— that failure would presumably be covered by the new car warranty. But as of the time of the car's importation, the brakes functioned as designed. Does the subsequent but premature failure of a part retroactively render the car "damaged," for § 158.12 purposes, as of the time of entry?

For purposes of resolving this appeal, we need not decide that issue. We conclude that although some repairs authorized under the various warranties may relate to damage that existed at the time of importation, they do not necessarily so relate. Saab's rigorous system for tracking and auditing warranty repair claims does not alter

this result. That system, which involves specialized databases that allow Saab to track all vehicle repairs by VIN and uses three levels of audits to ensure that dealers are making only appropriate warranty claims, certainly increases one's confidence that Saab's warranty claims in the aggregate are generally reliable. Operating as it does, however, by auditing a limited number of claims from a limited number of dealers, it provides somewhat less assurance that any particular warranty claim is valid. We acknowledge, of course, the probative value of the kind of statistical assurance that the auditing system provides, but conclude that our cases' emphasis on the need for specificity in allowance claims requires more than this kind of probabilistic evidence. The trial court's ruling regarding Saab's warranty expenses is entirely justified in light of this court's continuing emphasis on the principle that the importer "bears the burden of proving . . . that the costs to repair defects under consumer warranties were incurred to repair defects in existence at importation." Samsung II, 106 F.3d at 380 n.4. Saab has not met its burden here.

There remains the question of value. The trial court appears to have assumed that the value of Saab's port repairs was identical to the diminishment in value of the damaged merchandise. See Saab II, 306 F. Supp. 2d at 1287 (stating that Saab "is able to prove the amount of the allowance value for each entry" because the spreadsheet it provided "lists the total amount paid for each port repair expense"). The government makes a cursory argument, buried in a footnote, that Saab's repair evidence is not equivalent to "evidence demonstrating . . . the diminution in value of its merchandise." It is not clear that appellee raised this argument at trial, and its effort in this court is half-hearted; in any case, evidence of repair costs is a standard measure of

diminution in value in commercial law, and we see no reason to challenge that principle here.  See, e.g., Roy Ryden Andersen, 1 Damages Under the Uniform Commercial Code § 10:6 (2005) (Westlaw) (stating that "the overwhelming judicial consensus is that repair costs are presumtive [sic] evidence of the difference between the value of goods as accepted and their value as warranted") (citing numerous cases).  We affirm the trial court's holding that Saab satisfied its burden of proof with respect to the value of the allowances to which it was entitled.

## CONCLUSION

For the reasons set forth in this opinion, we affirm the judgment of the Court of International Trade.

## AFFIRMED.

No costs.