**Slip Op. 06-95**

**UNITED STATES COURT OF INTERNATIONAL TRADE**

FORD MOTOR CO.,

               Plaintiff,

               v.

UNITED STATES,

               Defendant.

Before:  Richard W. Goldberg,
          Senior Judge

Court No. 99-00394

<u>OPINION</u>

[Customs' motion to dismiss is granted.]

Dated: June 21, 2006

<u>Stein Shostak Shostak Pollack & O'Hara LLP</u> (<u>Stanley Richard Shostak</u> and <u>Heather Christi Litman</u>) for Plaintiff Ford Motor Co.

<u>Peter D. Keisler</u>, Assistant Attorney General; <u>Barbara S. Williams</u>, Attorney in Charge, International Trade Field Office, Commercial Litigation Branch, Civil Division, U.S. Department of Justice (<u>Saul Davis</u>), for Defendant United States.

**GOLDBERG, Senior Judge**: In this action, Plaintiff Ford Motor Co. ("**Ford**") seeks review of the denial of its Protest No. 2704-98-101394 contesting certain actions taken by Defendant United States Customs and Border Protection ("**Customs**") regarding the Entry CE 231-5174793-0 entered in Los Angeles on June 9, 1997 and liquidated on May 8, 1998 ("**the L.A. Entry**"). Customs filed a motion to dismiss for lack of jurisdiction and lack of standing under Article III of the U.S. Constitution ("**Customs'**

**Mot.**") on October 31, 2005.[1]  Ford filed a motion for summary judgment on the same day.  On January 23, 2006, Customs filed a motion for summary judgment on the merits.  Also on January 23, 2006, Ford filed a response to Customs' motion to dismiss ("**Ford's Resp.**").  Both parties filed replies on February 13, 2006.  For the reasons that follow, the Court grants Customs' motion to dismiss and dismisses the case for lack of subject matter jurisdiction.

## I.    BACKGROUND

Although this case is limited to a review of Ford's protest of the L.A. Entry, the underlying dispute between Customs and Ford dates back much further.  The L.A. Entry itself is

---

[1]  Customs refers alternately to its October 31, 2005 motion as a "cross-motion for summary judgment" and a "motion to dismiss and for summary judgment."  The motion seeks dismissal of the case for want of subject matter jurisdiction and standing, two matters normally dealt with on a motion under USCIT Rule 12 and not USCIT Rule 56.  See Robinson v. Union Pac. R.R., 245 F.3d 1188, 1191 (10th Cir. 2001) ("Seeking summary judgment on a jurisdictional issue . . . is the equivalent of asking a court to hold that because it has no jurisdiction, the plaintiff has lost on the merits.") (quotation marks omitted); Winslow v. Walters, 815 F.2d 1114, 1116 (7th Cir. 1987) (noting that because summary judgment has res judicata effect on the merits of the case, it would be inappropriate in cases where a court has not considered the merits, as with a jurisdictional challenge); cf. also Pringle v. United States, 208 F.3d 1220, 1222 (10th Cir. 2000) (holding that a motion to dismiss for lack of subject matter jurisdiction may be converted to a summary judgment motion only when "resolution of the jurisdictional question is intertwined with the merits of the case").  As such, Customs' motion is a motion to dismiss under USCIT Rule 12(b)(1), and will be referred to as such in this opinion.

comprised of 288 3.4L production engines that Ford purchased from Yamaha Motor Co., Ltd. ("**Yamaha**") for installation in 1996 1/2 Ford Taurus SHO automobiles in the United States. Those production engines were developed and produced pursuant to a series of agreements between Ford and Yamaha. Ford and Yamaha entered in to a "3.4L Engine Development Agreement" ("**Development Agreement**") effective as of September 1990. The purpose of the Development Agreement was to modify and improve the existing automobile engines used in the Taurus SHO. Ford and Yamaha also entered into a Supply Agreement effective in 1996 that outlined the terms according to which successful development projects would yield purchasable production engines. Engine prototypes constituted a crucial component of the development process. The Development Agreement itself explains the role prototypes were to play:

> 4.      Prototypes
>
> A (1) Prototype Engines and prototype parts that are required by Ford shall be purchased by Ford from Yamaha under separate purchase orders, in accordance with payment terms of Net 15th and 30th Prox. A specimen copy of the purchase order form is annexed hereto as Attachment VI. The printed terms and conditions of the purchase order shall apply to purchases pursuant to this Section 4. Ford, from time to time, may change its purchase order form but such change shall not amend or modify the respective rights and obligations of the parties hereunder.

Development Agreement ¶ 4A.   In total, Ford issued purchase orders to Yamaha for the purchase of 298 prototype engines, for which Ford paid Yamaha a total of ¥891,747,801, or $9,058,310.

Though some of the prototype engines purchased by Ford remained in Japan, many were imported into the United States. The majority of the imported prototypes entered under bond as temporary imports, that is, the prices paid to Yamaha for the prototype engines were declared but duties were not paid.   Ford imported a smaller number of prototype engines by means of consumption entries with payment of duties.

This 3.4L SHO engine program was not the first time Ford and Yamaha had collaborated in the design, development, and supply of prototype and production engines for use in Ford's Taurus model.   Years earlier, Ford and Yamaha had entered into similar agreements in connection with Ford's 3.2L SHO engine development program, which also involved Ford's importation of prototype engines from Yamaha.   The 3.2L SHO prototype program occasioned a dispute with Customs regarding the dutiability vel non of prototype engines.   By the time the L.A. Entry arrived in the United States, Customs had already issued two Customs Headquarters Rulings[2] regarding the dutiability of prototype

---

[2]   An importer may request a ruling letter from a Customs field office respecting the treatment of a prospective customs transaction.   See 19 C.F.R. § 177.9(a) (2005).   Customs' field offices may themselves request "internal advice" from Customs

engines in connection with the by-then obsolete 3.2L SHO engine development program.

In April 1994, Customs issued HQ 545278, in which it ruled on two issues impacting the duty treatment of the 3.2L prototype engine program as follows: (1) the value of imported prototype engines did not constitute an "assist,"[3] and was properly considered part of the "price actually paid or payable," 19 U.S.C. § 1401a(b)(4)(A), of the imported prototype engines themselves; and (2) the payments made to Yamaha for design and development of prototype engines should also be included in the transaction value[4] as part of the "price actually paid or payable" for subsequently imported production engines. See HQ

Headquarters "at any time." Id. § 177.11(a). The result of the process is usually a Customs Headquarters Ruling, detailing Customs Headquarters' "official position" as to the transaction in question. Id. § 177.11(b)(6). In the case of the two Headquarters Rulings relating to the 3.2L engine program, Customs officials at the Port of Detroit made a request for internal advice. Then, Ford requested reconsideration of the ruling, and Customs Headquarters responded by affirming its original ruling.

[3] An "assist" is a good or service that is "supplied directly or indirectly, and free of charge or at reduced cost, by the buyer of imported merchandise for use in connection with the production or the sale for export to the United States of the [imported] merchandise[.]" 19 U.S.C. § 1401a(h)(1)(A) (1999).

[4] The "transaction value" of imported merchandise is the statutorily preferred method of valuing merchandise for purposes of duty calculation. See 19 U.S.C. § 1401a(1) (1999). The transaction value of imported merchandise is "the price actually paid or payable for the merchandise when sold for exportation to the United States, plus" other specified additions. Id. § 1401a(b)(1).

545278 (April 7, 1994), available at 1994 U.S. Custom HQ LEXIS 327. Customs determined that the prototype payments were "inextricably linked to the design and development process." Id. at *8. In other words, Customs' treatment of the 3.2L prototype program amounted to "double-counting" the cost of the imported prototype engines by fully allocating the prototype costs to the transaction values of both the production engines and the imported prototypes themselves.

In October 1996, Customs affirmed its conclusion in response to Ford's request for reconsideration, stating that "[p]ayments relating to the prototypes are part of the price actually paid or payable of the imported production engines notwithstanding the fact that many of the prototypes were subject to duties upon their importation into the United States." HQ 545907 (Oct. 11, 1996), available at 1996 U.S. Custom HQ LEXIS 1946, at *10-11.

On May 9, 1997, Customs notified Ford that it had initiated a formal investigation of the 3.4L SHO Engine program under 19 U.S.C. § 1592[5] for its suspected "fail[ure] to declare the total

---

[5] Section 1592 of Title 19 outlines the civil penalties for fraud, gross negligence, and negligence where an importer, depriving the U.S. Treasury of duties owed, "may enter, introduce, or attempt to enter or introduce any merchandise into the commerce of the United States by means of any document or electronically transmitted data or information, written or oral statement, or act which is material and false, or any omission which is material[.]" 19 U.S.C. § 1592(a)(1)(A) (1999).

value of engineering, design and development costs for prototypes utilized in the subsequent importation of production merchandise." Decl. of Paul Vandevert, Ex. 4 ("**Notice Letter**"). After receiving the letter and reviewing its records, Ford conducted a conference call with Customs agents and determined that, applying the logic of HQ 545278 and assuming a conservative estimate of $17 million in payments to Yamaha for prototype engines, it owed Customs $425,000 in back duties for merchandise imported over a period of three years.

On November 5, 1997, Ford submitted a letter to Special Agent Robert L'Huillier of Customs' Office of Investigations, stating that it had completed a more thorough review and its records indicated $226,458 in back duties owed, based on $9,058,310 in payments to Yamaha since April 1994. See Decl. of Paul Vandevert, Ex. 5 ("**Nov. 5 Letter**"). That letter quoted from HQ 545907, and also provided that the additional duties owed "will be included with an unliquidated 3.4L SHO engine entry so as to permit Ford to file a formal protest under Section 514 (19 U.S.C. 1514) and later to serve Customs with a summons to institute Court proceedings." Nov. 5 Letter.

On November 20, 1997, Ford's customs broker Expeditors International of Washington, Inc. ("**Expeditors**") sent another letter to Detroit Customs attaching a copy of the Nov. 5 Letter and enclosing a check for $226,458 "as a supplemental tender of

duties on payments to Yamaha for prototypes for the 1996 1/2 MY SHO Engine Program." Decl. of Paul Vandevert, Ex. 6 ("**Nov. 20 Letter**"). The Nov. 20 Letter did not specify the entry, if any, to which the duties were to be allocated "so as to permit Ford to file a formal protest[,]" Nov. 5 Letter.

On January 29, 1998, another letter from Expeditors arrived on the desk of Linda Connor, a Customs agent at the Port of Detroit. See Decl. of Paul Vandevert, Ex. 7 ("**Jan. 29 Letter**"). That letter requested that the already deposited $226,458 in duties be "allocated" to the L.A. Entry, which Customs had not yet liquidated. See Jan. 29 Letter. Ford included a copy of the Customs receipt for the $226,458 with the Jan. 29 Letter.

Customs accepted the tender of duties. The L.A. Entry, one of many entries of production engines, occurred on June 9, 1997. Ford paid Yamaha a total of $1,329,629 for the production engines (along with various containers) in the L.A. Entry and declared, via Expeditors, the total "entered value" on its Entry Summary Form 7501[6] to be as much. See Customs' Mot., Ex. B (Customs Form 7501). The L.A. Entry was accounted for in the

---

[6] The customs regulations permit customs brokers to file an Entry Summary Form 7501 at the time of entry in order to obtain the immediate release of imported merchandise from Customs' possession. See 19 C.F.R. §§ 142.3(b), 142.12(a) (2005). The Entry Summary Forms expedite the customs processing of entries, but rely on accurate statements made by importers and their customs brokers.

Entry Summary Form 7501 by dividing the total invoiced payment of $1,329,629 into three separate transaction values for the three duty treatments to which the entry was entitled. Thus, Ford noted that $201,600 of the invoice price was entitled to duty-free treatment because the engines contained "other articles assembled abroad of domestically fabricated components," see Harmonized Tariff Schedule of the United States ("**HTSUS**") subheading 9802.00.8065. In addition, Ford noted an entered value of $65,979 for substantial containers and holders, which also corresponded to a zero duty rate, under HTSUS subheading 9803.00.50. The entered dutiable value for the 288 production engines was $1,062,050. Given the applicable duty rate of 2.7 percent, Customs assessed duties of $28,675.35 for the production entries, plus the addition of certain fees of $2147.03, for a total of $30,822.38. Nowhere in the Entry Summary Form 7501 did Ford or Expeditors mention the $226,458 in supplemental duties tendered.

On May 8, 1998, Customs liquidated the L.A. Entry. The computer printout documentation relating to that liquidation[7] demonstrates that Customs liquidated the L.A. Entry at a "paid amount" and "liquidated amount" of $30,822.38. An annotation

---

[7] The Customs printout is the product of the Customs Automated Commercial Systems ("**ACS**") program that tracks, controls, and processes data on U.S. customs transactions. See Decl. of Chi S. Choy ¶ 2.

appeared on the second page of the printout associating that entry with the $226,458 payment, and categorizing the tender as "PRIOR DISCLOSURE ONLY — LIQUID." Upon liquidation, the Entry Summary Form 7501 was stamped in red "AS ENTERED."

Ford filed Protest No. 2704-98-101394 on August 6, 1998. Customs denied the protest on December 31, 1998. On June 28, 1999, Ford commenced this case.

## II.  DISCUSSION

Absent jurisdiction, a court may not proceed in any cause, and must dismiss the case before it. "The requirement that jurisdiction be established as a threshold matter 'spring[s] from the nature and limits of the judicial power of the United States' and is 'inflexible and without exception.'" Steel Co. v. Citizens for a Better Envm't, 523 U.S. 83, 94-95 (1988) (quoting Mansfield, C. & L. M. R. Co. v. Swan, 111 U.S. 379, 384 (1884)); see also USCIT R. 12(h)(3) ("Whenever it appears . . . that the court lacks jurisdiction of the subject matter, the court shall dismiss the action."). Because the Court is convinced that subject matter jurisdiction does not lie in this case, it must dismiss the case forthright, and need not therefore consider the respective motions for summary judgment on the merits.

**A.   A Valid Protest of a Customs Decision Must Be Timely.**

Ford invokes the U.S. Court of International Trade's ("**CIT**") subject matter jurisdiction under 28 U.S.C. § 1581(a).

That jurisdictional grant enables the CIT to assert jurisdiction over "any civil action commenced to contest the denial of a protest, in whole or in part, under section 515 of the Tariff Act of 1930."  28 U.S.C. § 1581(a) (1999).  The referenced section 515 is codified at 19 U.S.C. § 1515, and lays out the procedures for administrative review of Customs decisions under the protest system.  Therefore, a prerequisite to the Court's 28 U.S.C. § 1581(a) jurisdiction is the filing of a valid protest under the protest statute, 19 U.S.C. § 1514.  See Saab Cars USA, Inc. v. United States, 434 F.3d 1359, 1365 (Fed. Cir. 2006).

The protest statute provides that "decisions of the Customs Service . . . shall be final and conclusive upon all persons . . . unless a protest is filed in accordance with this section . . . ."  19 U.S.C. § 1514(a) (1999).  One of the necessary elements of a valid protest is that it is timely.  See Juice Farms, Inc. v. United States, 68 F.3d 1344, 1346 (Fed. Cir. 1995).  Under 19 U.S.C. § 1514(c)(3), the time period within which a protesting importer must file its protest varies according to the circumstances of the protest.  The statute provides that "[a] protest of a decision, order, or finding . . . shall be filed with the Customs Service within ninety days after but not before (A) notice of liquidation or reliquidation, or (B) in circumstances where subparagraph (A) is inapplicable, the date of the decision as to which protest is made."  19 U.S.C. §

1514(c)(3) (1999).   In deciding whether a valid protest has occurred, then, a court must determine if subparagraph (A) <u>is</u> applicable to the facts of the case.   In most cases, this inquiry is summary; however, where, as here, the protest presents an unordinary and complicated customs transaction, a quick look will not suffice.

**B.    An Importer May Run the Ninety-Day Protest Period from the "Notice of Liquidation" Only When the Liquidation Is Materially Affected by the Protested Customs Decision.**

Subparagraph (A) runs the ninety-day protest period from the date an importer receives notice of a liquidation or reliquidation.   The Court reads that subparagraph as containing an implicit requirement that the "liquidation or reliquidation" be materially affected by the substance of the challenged decision.[8]   Without imposing such a requirement, the terms of the statute are such that any "decision of the Customs Service" could be protested within ninety days of the "notice of [any] liquidation or reliquidation," which is patently absurd because it would vitiate the institution a ninety-day time limitation period in the first place.   Put another way, "notice of

---

[8]   This is not to say that the notice must communicate to the importer the substance of Customs' decision <u>for the first time</u> in order to fall within the purview of subparagraph (A). Whether the notice represents the initial notification of a Customs decision, or whether the notice reiterates a position established prior to liquidation, some substantial nexus must exist between the liquidation being noticed and the substance of the protested decision.

liquidation" must refer to a <u>specific</u> liquidation, otherwise importers could bring challenges to Customs decisions years after the decisions were made, respecting entries that evince no logical connection to the protested decision.  <u>Cf.</u> <u>Gould v. U.S. Dep't of Health & Human Serv.</u>, 905 F.2d 738, 746 (4th Cir. 1990) (en banc) (rejecting as contrary to the purpose of a statute of limitations the possibility of an "open-ended rule").  Ford is therefore only entitled to the application of subparagraph (A) if the Court finds that the liquidation of the L.A. Entry was materially affected by the challenged Customs decision.

On the other hand, Subparagraph (B) applies to protests when Customs discloses the terms of its protested decisions independent of any liquidation.  <u>See</u> 19 C.F.R. § 174.12(e)(2) (2005) (providing a non-exhaustive list of "decisions of the Customs Service" to which subparagraph (B) applies).  In such circumstances, the protest period will run from "the date of the decision as to which protest is made."  19 U.S.C. § 1514(c)(3)(B) (1999).  If subparagraph (B) applies in this case, then the protest period began running from "the date of the decision," which was either (1) a date in mid- to late-1997 when Customs, after notifying Ford of its ongoing investigation, demanded a tender of back duties[9], or (2) October 11, 1996 (the

_____

[9]   Between May 9, 1997 (the date Customs informed Ford of its investigation), and Nov. 5, 1997 (the date Ford determined its

date Customs published HQ 545907, putting Ford on notice of Customs' decision that the cost of the prototype engines were includable in the transaction value of production engines[10]).  In either event, Ford's filing of a protest on August 6, 1998 was well after these ninety day windows had expired.  As such, Ford's protest is valid only if the Court determines that subparagraph (A) applies to this dispute.[11]

---

final liability from its invoices), Customs and Ford had been in negotiations as to the ultimate amount of liability Ford owed for its 3.4L prototype engines.  The Court assumes that some "decision" to demand duties from Ford occurred during that period.  Cf. Alcan Alum. Corp. v. United States, 28 CIT ___, ___, 353 F. Supp. 2d 1374, 1378-79 (2004) (holding that Customs' calculation of back duties owed and subsequent demand of that amount following an investigation was a protestable decision under 19 U.S.C. § 1514).  However, even assuming the protestable decision occurred on the last day of this period, Ford's protest would still have been late.

[10]    Nothing in 19 U.S.C. § 1514 prevents an importer from protesting a 19 C.F.R. § 177 Headquarters Ruling, see supra note 2, provided the strictures of Article III standing under the U.S. Constitution are met.  Though the case law is sparse in this regard, examples of such cases do exist.  See, e.g., Conair Corp. v. United States, 29 CIT ___, Slip Op. 05-95 (Aug. 12, 2005).  In that case, the importer first requested and received a letter ruling from the Port of New York regarding the classification of merchandise.  See NY F83276 (Mar. 15, 2000), available at 2000 US Customs NY LEXIS 1803.  Then, the importer requested and received reconsideration from Customs Headquarters, which affirmed NY F83276.  See HQ 964361 (Aug. 6, 2001).  Thereafter, the importer protested, and Customs denied the protest.  Finally, the importer commenced a case in the CIT, which asserted its 28 U.S.C. § 1581(a) jurisdiction.  See Conair, 29 CIT at ___, Slip. Op. 05-95 at *3-*4.

[11]    Lamentably, Ford did not avail itself of the most obvious course of action in this case.  Had Ford simply declared the costs of its prototype program from the outset, it would have

In this case, Ford is challenging "Customs' decision that the costs of the prototypes were properly includable in the 'price actually paid or payable' for the production engines in the subject entry." Ford's Resp. at 6-7 (quoting 19 U.S.C. § 1401a(b)(1) (1999) (defining dutiable "transaction value" as including "the price paid or payable")). However, the liquidation of the L.A. Entry relates to this protested decision only by virtue of a legal and accounting contrivance that Ford concocted itself. Specifically, Ford attempted to allocate the duty amount owed for the entire prototype program to the transaction value of the production engines in the L.A. Entry.

**C.    The Terms and Circumstances of the Liquidation of the L.A. Entry Demonstrate No Material Link to the Protested Decision.**

Assuming arguendo that the Customs officials at the Port of Detroit agreed to Ford's request to allocate the $226,458 to the L.A. Entry, and endeavored to communicate as much to the Customs officials at the Port of Los Angeles, there is no evidence that such allocation was actually and practically accomplished.[12] As

---

had ninety days from the liquidation of the first entry of production engines within which to file its protest, over which the Court would unambiguously possess jurisdiction. Instead, Ford was subject to an investigation under the penalty statute 19 U.S.C. § 1592 and attempted to craft a "do-it-yourself" solution.

[12]    It is of no legal relevance that Customs, or any of its officials, may have intended to accommodate Ford's request to commence an action under 28 U.S.C. § 1581(a). An administrative

such, the Court finds that the requisite nexus between the protested decision and the liquidation of the L.A. Entry is lacking. For this reason, subparagraph (A) cannot apply, and the protest was untimely and invalid.

As discussed above, on November 5, 1997, Ford informed Customs of its intention to have the $226,458 payment "included with an unliquidated 3.4L SHO engine entry so as to permit Ford to file a formal protest . . . ." Nov. 5 Letter (emphasis added). On November 29, 1997, Expeditors transmitted that payment to Customs. See Nov. 29 Letter. Over two months later, Expeditors requested that the payment be allocated to [the L.A. Entry]." Jan. 29 Letter (emphasis added). Customs admits that its agents "appeared to agree to this process, because [they] allocated the payment of the $226,458.00 to the entry which Ford requested be liquidated, by adding this amount to the entry . . . ." Customs' Mot. at 11 (emphasis added).

_____

agency may not waive the U.S. government's sovereign immunity by consenting to be sued. Such consent may only come from an unequivocal expression of Congress. See Irwin v. Dep't of Veterans Affairs, 498 U.S. 89, 95 (1990). Because Congress provided a framework, in 19 U.S.C. § 1514, for civil suits challenging Customs decisions, a plaintiff must look to that statute, and that statute alone, to obtain its relief.

However, "allocation" and "inclusion" are distinct concepts from liquidation.[13] The seed of any valid protest under subparagraph (A) must be a liquidation that is affected by the protested decision, see 19 U.S.C. § 1514(c)(3)(A). If "allocation" and "inclusion" simply refer to the process of appending documentation relating to another separate transaction, then those processes have no relevance to the question of whether subparagraph (A) will apply to the liquidation. An importer may not avail itself of the protest procedures by simply allocating a payment to an entry that otherwise is logically unconnected to the protested decision. Absent a formal rule-making process, neither an importer nor Customs may create a new analogue to statutorily-recognized liquidation. Customs makes this distinction in its motion to dismiss, noting that despite the undeniable association of the payment with the L.A. Entry, "Customs never actually liquidated this entry to include the $226,458.00 in the actual value and liquidated duties for this entry."[14] Customs' Mot. at 11. After

---

[13] "Liquidation means the final computation or ascertainment of the duties . . . accruing on an entry." 19 C.F.R. § 159.1 (2005).

[14] Ford points out that in its Answer, Customs admits to paragraph 16 of Ford's Amended Complaint, which states: "The ¥891,747,801 paid by Ford to Yamaha for the 3.4 liter prototype engines, was treated as part of the price 'actually paid or payable' for the 288 production engines in the [L.A. Entry]." Complaint ¶ 16; see also Answer ¶ 16 (admitting the same). In

examining the ACS printout, the Court agrees with Customs that, despite any allocation or inclusion, "[t]here was never any liquidation or appraisement of merchandise encompassed by this case that actually included any portion of the amount in dispute."  Id.

The ACS printout documentation consists of two pages.  The first page is the routine document relating the specifics of the liquidation.  That page lists the "paid amount" and the "liquidated amount" at $28,675.35.  That sum was derived from applying the then applicable 2.7 percent duty rate to the declared value of the entered production engines themselves,

_____

spite of that admission, Customs is currently arguing that the payment of duties that corresponded to the ¥891,747,801 at issue was never included in the transaction value of the production engines in the L.A. Entry.

The Court interprets the evidence independently, and may rely on the extensive discovery in this case occurring over a seven year period.  At such a late stage in the proceedings, a court is hardly compelled to bind itself to the mast of a defendant's pleadings and assert its jurisdiction over a case it has no authority to adjudicate.  See USCIT R. 12(h)(3) ("Whenever it appears by suggestion of the parties or otherwise that the court lacks jurisdiction of the subject matter, the court shall dismiss the action."); cf. also Grafon Corp. v. Hausermann, 602 F.2d 781, 783 (7th Cir. 1979) ("The district court may properly look beyond the jurisdictional allegations of the complaint and view whatever evidence has been submitted on the issue to determine whether in fact subject matter jurisdiction exists."); Nat'l Union Fire Ins. Co. of Pittsburgh, PA v. BP Amoco P.L.C., 319 F. Supp. 2d 352, 368-69 (S.D.N.Y. 2004) (noting that a court, when ruling on a motion to dismiss for lack of jurisdiction, must construe pleadings in favor of plaintiff only when jurisdictional discovery has not occurred). The Court therefore has no difficulty disregarding the purported admission of jurisdiction contained in Customs' Answer.

independent of any supplemental amount, on either a pro rata or lump-sum basis, for the prototype engines. The page also indicates that the entry was subject to fees and taxes amounting to $2147.03. In total, the amount owed on the L.A. Entry was $30,822.03. The notation "NO CHANGE—LIQ" appears below the liquidation data, and is evidence that the liquidation was based on the declared values without any changes or modifications in the transaction.[15] There is no mention of the $226,458 payment Ford made for the prototype engines on the first page.

By contrast, the second page of the ACS printout mentions the $226,458 payment and contains the notation "PRIOR DISCLOSURE ONLY—LIQUID." That terminology signifies to Customs that the tender was treated as relating to an entry that already had been liquidated. See Decl. of Mary Ann Morris ¶ 9. The reference to the prior disclosure procedures is almost certainly inapposite, since those procedures permit an importer to disclose instances of underpayment of duties prior to Customs' discovery in exchange for limited immunity from 19 U.S.C. § 1592 negligence and fraud liability. See 19 C.F.R. §§ 162.73(b), 162.74(a)

---

[15] The Court's interpretation of the "NO CHANGE—LIQ" notation is supported by a similar notation that appears on the Entry Summary Form 7501. At the time of liquidation, the L.A. Entry Form 7501 was stamped "AS ENTERED," a label that "possesses the same meaning as 'No Change Liq' — it means that Customs liquidated this entry at the amount deposited by the importer at the time of entry." Decl. of Chi S. Choy ¶ 8.

(2005). Here, both parties acknowledge that Ford discussed its prototype program with Customs only <u>after</u> Customs informed Ford of an ongoing section 1592 investigation. However, that notation is instructive in placing the unordinary $226,458 payment in context.

The use of the "prior disclosure" notation accentuates the anomaly of Ford's attempted accounting feat. Typically, a prior disclosure will occur after entry and liquidation. The notation is helpful to signify that although the entry and liquidation documentation is incomplete, Customs may not pursue the full panoply of civil penalties for deprivation of duties under 19 U.S.C. § 1592. In a typical case, this is an unremarkable "tender on an entry that had already been liquidated." Decl. of Mary Ann Morris ¶ 9. When the Customs officials borrowed this terminology from an obviously inapposite context, the Court supposes they were doing their best to document a unique transaction.[16] Whatever its underlying impetus was, the notation clearly places the payment in the context of a settlement of the

---

[16] The Court expresses its doubts whether Customs possesses the authority, given an ongoing 19 U.S.C. § 1592 enforcement proceeding, to effectuate this unique liquidation transaction in the first place. Because the Court finds that whatever the parties' intentions, such a transaction was not in fact effectuated in this case, it need not decide the tougher question of whether this sort of transaction would have been ultra vires and invalid if successfully accomplished.

negligence and fraud claim that Customs had already started investigating under 19 U.S.C. § 1592.

Section 1592(d) requires Customs to recoup any deprived duties, "whether or not a monetary penalty is assessed." 19 U.S.C. § 1592(d) (1999). The ACS documentation relating to the L.A. Entry is consistent with a routine liquidation of the production engines, accompanied by an appended form documenting the settlement of a 19 U.S.C. § 1592 claim. Even if the tender is not construed as a settlement of the section 1592 claim, it is pellucid that the L.A. Entry was not liquidated to include the prototype engine costs. The documentation testifies to two distinct and unrelated transactions. Therefore, the Court is unable to find any evidence that the protested decision materially affected the liquidation of the L.A. Entry, and the protest period did not run from the date of liquidation under subparagraph (A).

As such, any protest was untimely and invalid, and the Court lacks jurisdiction under 28 U.S.C. § 1581(a). See Saab Cars USA, 434 F.3d at 1365.

### III. CONCLUSION

The Court finds that the L.A. Entry was not materially affected by the protested "decision of the Customs Service," 19 U.S.C. § 1514(a). Therefore, Ford is not entitled to have its protest period run from the date of liquidation of the L.A.

Entry as contemplated by subparagraph (A) of 19 U.S.C. § 1514(c)(3), and its protest was untimely under subparagraph (B). Accordingly, there can be no valid protest under 19 U.S.C. § 1514 and subject matter jurisdiction does not lie under 28 U.S.C. § 1581(a).  This case is dismissed for lack of subject matter jurisdiction.  The Court will issue an order in accordance with this opinion.

/s/ Richard W. Goldberg
**Richard W. Goldberg**
**Senior Judge**

**Dated:** **June 21, 2006**
**New York, New York**