John A. YAGJIAN

v.

John O. MARSH, Secretary of the Army; Army Board for Correction of Military Records; John W. Matthews, Executive Secretary.

Civ. A. Nos. 83–0177B (DRI), 82–0164 (DNH).

United States District Court, D. New Hampshire.

July 20, 1983.

Charles A. Meade, Stephen R. Fine & Associates, Manchester, N.H., for plaintiff.

Robert J. Lynn, Asst. U.S. Atty., D.N.H., Concord, N.H., Steven M. Post, Captain JAGC, Military Personnel Branch, Litigation Div., Office of Judge-Advocate Gen., Dept. of the Army, Washington, D.C., for defendant.

## OPINION

FRANCIS J. BOYLE, Chief Judge.

This is an action for judicial review of a decision of the Army Board for Correction of Military Records. Jurisdiction is asserted under 5 U.S.C. § 702 (1976) and 28 U.S.C. § 1361 (1976). *See generally Ashe v. McNamara*, 355 F.2d 277, 280–81 (1st Cir. 1965). The Defendants, Secretary of the Army, and Executive Secretary of the Army Board for Correction of Military Records, have moved to dismiss the action, or, in the alternative, for summary judgment.

Plaintiff John A. Yagjian is sixty-nine years old. He suffers from a rare, malignant form of T-cell lymphoma called mycosis fungoides, which has totally and permanently disabled him. Mycosis fungoides is an insidious disease, which usually progresses slowly, but relentlessly, through three stages, the first of which being the premycotic or non-specific stage. This stage may last for years, decades, or even a lifetime, during which time the disease manifests itself in the form of an inflammatory, pruritic (itchy) rash. In this early stage, it is commonly misdiagnosed as eczema, psoriasis, or chronic dermatitis. In fact, a biopsy diagnosis at this stage would not reveal abnormal cells.

The disease can remain in this first stage, but a certain percentage of cases progress to the plaque stage, in which the rash spreads and the skin lesions become red, thickened and scaly. Severe itching and burning persist, and the lesions can gradually become larger and possibly ulcerate, causing the skin to blister. Mr. Yagjian presently exhibits the symptoms of this second stage. The rash has covered most of his body.

The third stage of mycosis fungoides is known as the tumor stage, during which the disease causes the development of mushroom-like nodules on the body. These tumors tend to break down and cause ulcers, and they have the capacity to spread to lymph glands and other internal organs. The disease can prove fatal if it reaches this point. It is impossible to predict whether, or when, Mr. Yagjian's condition will progress to this stage. Thus far, he has undergone numerous skin biopsies, and been treated with countless creams, soaps and salves, topical nitrogen mustard, topical chemotherapy, and total body electron beam. There is no known cure for mycosis fungoides.

On July 22, 1976, John Yagjian was examined at the Veteran's Administration Hospital in Manchester, New Hampshire in order to be evaluated for disability benefits based on mycosis fungoides. When he was examined, he told the doctor that he was first troubled by the red, itchy rash which started in his groin area two months after entering the service in 1944. He explained that the rash had worsened over the years, but mostly in the previous three years, and that the itching and burning had now become almost intolerable. Dr. Seymour J. White, a dermatologist, examined Mr. Yagjian, and noted that the rash now covered most of his skin surface. In spite of a skin biopsy done at that time, reportedly indicating parapsoriasis, Dr. White noted, "[c]linically my impression would be . . . that this is an early mycosis fungoides."

On November 30, 1976, Mr. Yagjian's disability compensation claim was denied because the Adjudication Officer at the V.A. Regional Office in Manchester found that his skin condition was not service connected. In a Supplemental Statement of the Case dated December 1, 1976, the reason given for this determination was: "Service records are entirely negative for complaint of, observation of, or treatment for any skin

condition." Plaintiff then took his case to the Board of Veteran's Appeals.

Plaintiff had consistently stated that: 1) his skin rash first appeared in 1944 after he was in the service for two months; 2) that he sought medical attention for the problem approximately eighteen to twenty times while in the service at various Army bases; and 3) that he described the rash to the doctor who examined him upon his discharge from the service, but the doctor assured him that it was of no consequence and would soon disappear. In a Herculean effort to prove to the Board these contentions regarding the onset and progression of his disease, Mr. Yagjian tried to obtain appropriate and convincing evidence for his appeal. He searched for past acquaintances who would remember him, and who had knowledge of his skin problem during the service and thereafter. He found many of these individuals, and obtained affidavits and statements from them. He provided opinions from several dermatologists, including a recognized expert in the study of mycosis fungoides, all of whom had treated him. Without exception, the evidence from lay persons strongly supported Mr. Yagjian's contention that he first became afflicted with the rash in 1944, several months after entering the service, that he repeatedly went for medical attention while in the service, and that he had suffered from the rash continuously from that time to the present. The dermatologists were unanimous in their expert opinions that the disease is one which often takes decades to reach its various stages, and that the rash Mr. Yagjian had in the service was most probably the precursor of his present condition.

For additional support for his claim, Mr. Yagjian wrote to the National Personnel Records Center in St. Louis, Missouri on August 22, 1978 in order to obtain his military medical records. On August 28th, the Center informed him that his record had not been found, but that "[w]e are trying to obtain the required information from alternate record sources in order to reconstruct the military service data." Efforts to reconstruct his military record resulted in only a report of his induction physical, a report of his discharge physical, and his 1945 application for disability compensation based on a back injury suffered while on active duty. Unfortunately, these three records were silent with regard to any skin rash. Furthermore, there were no reports of any of Mr. Yagjian's alleged eighteen to twenty visits to Army doctors seeking treatment for the rash. On September 28, 1978, the National Personnel Records Center informed Mr. Yagjian that his service medical records were not in its files, and further, "If the record was here on July 12, 1973, it would have been in the area that suffered the most damage in the fire on that date and may have been destroyed." It thus became impossible for him to provide a complete military medical record to the Board.

On October 20, 1978, the Board of Veteran's Appeals held a hearing on this matter in Manchester, New Hampshire. The Board heard testimony from Mr. Yagjian, and Drs. Seymour White and Robert Gordon (two of the dermatologists who had most recently been treating Mr. Yagjian). Ultimately, however, in spite of the evidence presented by Mr. Yagjian, and in spite of the fact that his service medical records were probably destroyed in a fire while in the custody of the United States Government, the Board denied his appeal based on the lack of any mention of a skin problem in his service records. Mr. Yagjian's incomplete service record was clearly the major obstacle preventing him from proving that his mycosis fungoides was service connected, and thereby also preventing him from obtaining disability benefits.

With the assistance of the VET Project in Concord, New Hampshire, Mr. Yagjian then filed an Application for Correction of Military or Naval Record with the Army Board for Correction of Military Records [hereinafter referred to as ABCMR]. The ABCMR had before it all of the aforementioned evidence, which was contained in Mr. Yagjian's V.A. claims folder. In addition, Mr. Yagjian submitted a brief in support of his application, his own affidavit, an affidavit

from Dr. William E. Clendenning, affidavits from two men who served in the Army with Mr. Yagjian, evidence of his efforts to obtain his medical records from the National Personnel Records Center, and the three documents that did exist in his military record by virtue of alternate sources. His application was denied without a hearing in the ABCMR's Memorandum of Consideration dated April 1, 1981.

On June 2, 1981, the Adjutant General notified Mr. Yagjian that further consideration of his application was not contemplated by the ABCMR unless he produced "new material evidence tending to show existence of error or injustice in the military records[.]" On July 20, 1981, Mr. Yagjian requested reconsideration of his application based on material evidence in the existing record that was not originally considered by the ABCMR, and evidence that he asserted to be newly discovered and relevant. In a Memorandum of Consideration dated November 25, 1981, the ABCMR denied without a hearing the request for reconsideration. This action followed.

█ It is well-established that a reviewing court may not reverse a decision of the Army Board for Correction of Military Records unless the applicant can show that the ABCMR's decision was arbitrary, capricious, or not supported by substantial evidence. *See Chappell v. Wallace,* —— U.S. ——, ——, 103 S.Ct. 2362, 2366, 76 L.Ed.2d 586 (1983); *Grieg v. United States,* 640 F.2d 1261 (Ct.Cl.1981), *cert. denied,* 455 U.S. 907, 102 S.Ct. 1251, 71 L.Ed.2d 444 (1982); *Ashe v. McNamara,* 355 F.2d 277, 281 (1st Cir. 1965).

Recently, the Supreme Court applied the "arbitrary and capricious" standard to determine whether the National Highway Traffic Safety Administration's rescission of a safety regulation was valid. *See Motor Vehicle Manufacturers Association of the United States, Inc. v. State Farm Mutual Automobile Insurance Co.,* —— U.S. ——, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983). The Court noted that "[t]he scope of review ... is narrow and a court is not to substitute its judgment for that of the agency. Never-

theless, the agency must examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *Id.* at ——, 103 S.Ct. at 2866 (*quoting Burlington Truck Lines v. United States,* 371 U.S. 156, 168, 83 S.Ct. 239, 245, 9 L.Ed.2d 207 (1962)). The Court continued:

> In reviewing that explanation, we must "consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Bowman Transp., Inc. v. Arkansas-Best Freight System,* [419 U.S. 281] at 285 [95 S.Ct. 438, at 441, 42 L.Ed.2d 447 (1974)]; *Citizens to Preserve Overton Park v. Volpe,* [401 U.S. 402] at 416 [91 S.Ct. 814, at 823, 28 L.Ed.2d 136 (1971)]. Normally, an agency rule would be arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*Id.*

In light of this standard, and the fact that John Yagjian has not presented any new evidence for this Court's consideration, it is necessary to examine with scrutiny the record that was before the ABCMR in order to determine whether the denial of Mr. Yagjian's application was arbitrary, capricious, or not supported by substantial evidence. The Court will therefore recount the evidence with some particularity.

The ABCMR considered the following medical evidence, which was contained in Mr. Yagjian's V.A. claims folder:

1. Report dated November 30, 1976, from Dr. Seymour White, a dermatologist with the Manchester V.A. Hospital who first examined Mr. Yagjian for disability benefits. In this report, Dr. White stated that it was his opinion that Mr. Yagjian's present condition "is almost certainly the

same skin condition for which he was treated while in the service." He went on to conclude, "[t]herefore, to repeat, it is my opinion that we are now dealing with the very same condition which first manifested itself when he was in the service."

2. Letter dated April 27, 1977 from another treating physician, Dr. Robert D. Gordon, Chief Resident, Dermatology, V.A. Center, White River Junction, Vermont. Dr. Gordon wrote: "It is known that the duration of mycosis fungoides is indeed variable and we feel that for Mr. Yagjian it started while in the service. . . ."

3. Letter dated May 23, 1977 from Dr. William E. Clendenning, Professor of Dermatology at Dartmouth Medical School and eminent authority on mycosis fungoides who supervised Mr. Yagjian's treatment at the Mary Hitchcock Memorial Hospital, Hanover, New Hampshire. Dr. Clendenning wrote that because of the insidious nature of the disease, he had "no reason to doubt Mr. Yagjian's contention that this problem did begin in 1944 and, indeed, he has provided reasonable affidavit certification of this."

4. Letter from Dr. Gordon, dated June 16, 1977, in which he wrote:

"It is known that mycosis fungoides starts as an eczematous dermatitis, then evolves into an infiltrative plaque stage, and can finally evolve into tumors. There may be several years between stages and therefore after seeing Mr. Yagjian's records and observing his current clinical status, I strongly believe that his condition first started in 1944."

5. Letter from Dr. White, dated November 15, 1977, stating that "[w]ithout consulting Mr. Yagjian's history, a knowledge of the natural history of this disease definitely makes it most probable to state that a condition similar to his could very well have arisen years and decades before it became severe enough and obvious enough for the final diagnosis to be established."

6. Letter from Dr. Gordon dated March 29, 1978, in which he stated that "[t]he available evidence that Mr. Yagjian has plus the known course of this disease is totally consistent with an onset in 1944."

The ABCMR had all of these letters before it when it initially denied Mr. Yagjian's request to correct his military record. It also had for consideration an affidavit from Dr. Clendenning dated May 22, 1980. In this affidavit, Dr. Clendenning explained that a substantial portion of his medical research had been devoted to the "problems of understanding and managing mycosis fungoides." He further found that the case history given by Mr. Yagjian—appearance of rash on lower abdomen in 1944 while in the Army; assurance from Army doctors that the condition was innocuous; extensive post-service efforts to obtain medical relief until mycosis fungoides was diagnosed in 1977—was "consistent with the onset of mycosis fungoides in 1944." Significantly, Dr. Clendenning concluded: "I have examined the evidence presented by Mr. Yagjian to the Veterans Administration, the evidence presented to this Board, and Mr. Yagjian himself. It is my considered opinion, to a reasonable medical certainty, that Mr. Yagjian developed mycosis fungoides in 1944."

Mr. Yagjian also provided the ABCMR with an affidavit from Norbert W. Gottsman, Jr., a Staff Sergeant in the Army Air Corps from 1943–45 who was billeted with John Yagjian at SAACC Field in San Antonio, Texas. Mr. Gottsman testified that he was aware of Mr. Yagjian's "problem with itching and inflammation above his groin area," and that he "granted him permission to go on sick call to obtain treatment for his condition." Another affiant, Mr. Robert L. Lippner, Sr., was stationed at Camp Livingstone, Louisiana in the same barracks with John Yagjian in 1945. He stated: "I remember very well that John had red seemingly irritated areas left and right of center of his lower abdomen. These areas seemed to itch a great deal and John was constantly scratching them. I met John Yagjian several different times when we were both on sick call. Each time we so met he was seeking medical help to relieve him of the discomfort caused by this skin condition." In his own affidavit, Mr. Yagjian described

in detail the onset of the rash in 1944, his efforts to obtain medical relief at the various locations to which he was transferred during the service, the progression of the disease from the time of his discharge to the present, and his efforts to obtain disability benefits.

In considering Mr. Yagjian's application, the ABCMR also sought an advisory opinion from the Office of the Surgeon General. That opinion was rendered by Dr. George R. Helsel, Chief of the Evaluation and Inquiries Branch, after a review of Mr. Yagjian's Army and V.A. files, but without a physical examination of him. Entitled "Medical Evaluation" and dated September 25, 1980, the half-page opinion does not indicate whether it was derived with the aid of a dermatologist. Dr. Helsel concluded that Mr. Yagjian's contentions were not supported by objective evidence of record, stating his reasoning thus:

"In order for this office to establish that a disease or condition existed during a prior period of active duty there must be some type of suggestive evidence of record to indicate the presence of the condition. In this case the complete absence of even a hint prohibits a favorable determination."

Without supporting documentation, Dr. Helsel questioned whether it could be "positively established" that Mr. Yagjian's mycosis fungoides existed more than thirty-six years ago. Further, Dr. Helsel wondered whether John Yagjian had a different skin rash when he was in the service, totally unconnected with his present condition.

Based on the evidence before it, the ABCMR did not dispute that Mr. Yagjian is currently afflicted with mycosis fungoides, nor that the disease is latent for a long period of time. It stated, however, that there was no evidence that Mr. Yagjian suffered from a skin condition between 1945 and 1974. It also considered significant the fact that Mr. Yagjian did not mention a skin condition shortly after his discharge from the service when he applied for disability benefits due to his back injury.

In response to the overwhelming medical opinion in support of Mr. Yagjian's contention that he developed mycosis fungoides in the service in 1944, the ABCMR, adopting the suspicion of Dr. Helsel, from the Surgeon General's office, made one comment in its decision: "The contention that a skin condition he might have had in 1945 is the same one he has now, as opposed to a disease incurred any time from 1946 forward, *even when made by eminent medical authority,* is conjecture nevertheless." (emphasis added) In its discussion, the ABCMR further explained that, "in view of the presumption of administrative corrections [sic] of records such as the applicant's discharge medical examination, the burden is on the applicant to show error or incompleteness. He has not met that burden." This determination was made even though it is beyond doubt that mycosis fungoides initially develops as a psoriasis- or dermatitis-type condition and cannot be accurately diagnosed at that stage, and even though these medical facts are strongly supportive of Mr. Yagjian's contention that all of the doctors who saw him during the service, including the physician who examined him upon discharge, routinely dismissed his problem as a minor one, so minor that it did not warrant a notation on his discharge physical report.

With regard to Mr. Yagjian's contention that he sought medical relief for his skin condition numerous times while on active duty, the ABCMR apparently concluded that this was not so. In spite of Mr. Yagjian's own sworn statement, and in spite of the two previously described affidavits from fellow servicemen, one of whom was Yagjian's superior and gave him permission to go on sick call, the ABCMR found that "there is no timely medical evidence" to prove that Yagjian went to doctors for his rash while in the service.

Ultimately, the ABCMR concluded that there was no basis upon which to grant Mr. Yagjian's requested correction. One of its primary reasons for denying the application was that Mr. Yagjian's military medical records contained no evidence to support his

contentions. Again, it must be emphasized that this was in spite of the fact that Mr. Yagjian's military medical records were lost or destroyed while in the possession of the United States government, through no fault of his own. The ABCMR thus took the untenable position of telling Mr. Yagjian that it could not correct his military record because he had no military record on which to base that correction. Mr. Yagjian was faced with the Sisyphean task of trying to effect a correction of his record by producing records that concededly did not exist.

In his request to the ABCMR for reconsideration of its decision, Mr. Yagjian's VET Project representative first pointed out that "upon examination of this Board's Memorandum and its request to the Veterans Administration for documents, it became clear that certain material evidence contained in Mr. Yagjian's claim folder was not acquired or considered." Specifically, the material evidence consisted of two letters from Dr. Seymour White, the transcript of the hearing before the Board of Veterans Appeals, and three affidavits and two letters attesting to Mr. Yagjian's attempts to find relief for his rash in 1946, 1949, 1950 and 1951. In light of its finding that there was no evidence whatsoever of any skin condition from 1945 to 1974, the ABCMR could not possibly have considered the latter affidavits and letters.

In addition, Mr. Yagjian provided as newly discovered relevant evidence a character reference, another letter from Dr. Robert Gordon, and seven more affidavits supporting his contention that the disease had been in existence, unchanged, since shortly after his entrance into the Army until the present time.

Upon reconsideration of Mr. Yagjian's application, the ABCMR again sought an advisory opinion from the Office of the Surgeon General. This time it was specifically requested that dermatology and oncology consultants review Mr. Yagjian's application, military and medical records, in order to furnish a "comprehensive comment" on the issue raised. In response, the Consultant to the Surgeon General in Dermatology submitted a report to Dr. Helsel, Chief of the Evaluation and Inquiries Branch. Apparently, the Consultant gave credence to the affidavits provided in response to the ABCMR's concern that there was no evidence of the continuation of Mr. Yagjian's disease from 1944 to the present, as he stated: "I am absolutely convinced that John A. Yagjian has mycosis fungoides, and that *his entire skin history from 1944 to the present* is very consistent with mycosis fungoides." (emphasis added)

The Consultant was also of the opinion that "it is very probable that the complaints which Mr. Yagjian had during his first two months of active duty were consistent with the first stages of mycosis fungoides." This statement, however, has no support from any evidence of record. Mr. Yagjian has repeatedly stated that he first developed a skin rash approximately two months *after* he entered the service. All of the affidavits submitted on his behalf were consistent with these statements. Other than mere speculation, there was no evidence of record to suggest that Mr. Yagjian had a skin rash *during* his first two months in the service.

The Consultant also stated that "Objectively, . . . , during the period 4–14–1944 to 11–1–1945 I saw no documented evidence from the claimant's medical records that he had any cutaneous problems." Most certainly this is an accurate statement since Mr. Yagjian's military record was not in the files of the National Personnel Records Center, was probably destroyed by fire, and could not be reconstructed from alternate sources. There could be no documented evidence from that period of time other than the reports of Mr. Yagjian's induction and discharge physicals.

Continuing with his findings, the Consultant stated that "it is also probable that Mr. Yagjian's skin complaints existed prior to service entry as well as being aggravated by service duty." Why this is *probable* is by no means clear from the Consultant's report. In fact, the Consultant goes on to acknowledge that there is absolutely "no scientific nor medical documentation to sub-

stantiate or refute this *possibility.*" (emphasis added) From one sentence to the next, the notion that Mr. Yagjian had a skin rash prior to entering the service went from a probability to a possibility. Other than mere conjecture, or concluding that Mr. Yagjian and a host of others who provided sworn statements were lying, there is no basis upon which to conclude that Mr. Yagjian had the earliest symptoms of mycosis fungoides prior to 1944. Furthermore, such a conclusion implies that the report of Mr. Yagjian's induction physical, which makes no mention of a skin condition, is erroneous. That record is entitled to the same presumption of correctness as the report of his discharge physical. Had the Defendants challenged that presumption, they would have been obligated to present evidence in support of their position and Mr. Yagjian would have been given an opportunity to counter the attack with evidence favorable to his application. The record is devoid of any such argument.

Finally, the Consultant concludes, "I would wholeheartedly concur with Dr. Clendenning's opinion that within reasonable medical certainty John Yagjian may have had the earliest cutaneous expressions of mycosis fungoides in 1944 and that is absolutely certain that he currently has mycosis fungoides." Again, the Consultant's review of the evidence resulted in a misleading inaccuracy. Dr. Clendenning stated in his affidavit that it was his "considered opinion, to a reasonable medical certainty, that Mr. Yagjian developed mycosis fungoides in 1944[,]" not that he may have developed it in 1944.

In his report to the ABCMR, Dr. Helsel commented on the Consultant's findings. His opinion was that if the ABCMR determined that Mr. Yagjian did have mycosis fungoides during the period of active military service, "it must also recognize the EPTS [existed prior to service] status of the illness based upon good medical knowledge of the natural course of the disease."

In the end, the ABCMR found that Mr. Yagjian probably suffered from mycosis fungoides while in the service. It accepted virtually every contention made by Mr. Yagjian with the exception of the onset of the disease while he was in the service. Its final refusal to change Mr. Yagjian's record to reflect the inception of mycosis fungoides during his military service was based exclusively on Dr. Helsel's indication that "good medical knowledge shows that the disease was probably EPTS." This Court finds that if such "good medical knowledge" existed, it was not a part of the record before the ABCMR. Dr. Helsel was not a dermatologist and was not independently knowledgeable about the natural course of mycosis fungoides. His reliance on "good medical knowledge" of the natural course of mycosis fungoides had to spring from his reading of the Dermatology Consultant's comments. The Consultant, however, said nothing about "good medical knowledge" in his report, but merely speculated that Mr. Yagjian's rash probably existed prior to the service. Furthermore, in the next breath he changed that probability to a possibility. Every medical opinion before the ABCMR except this Consultant's comment was to the contrary. Although mycosis fungoides is a latent disease, it must begin at some point in time. There is simply no evidence that its victims are born with it, nor is there evidence that a period of time exists during which a victim has the disease but has no visible symptoms of it.

■ Without the "good medical knowledge" referred to in the ABCMR's discussion, the decision to deny Mr. Yagjian's application was based solely on the questionable inference that he probably had the disease prior to entering the service and amounts to little more than surmise. As noted *supra,* the issue of whether Mr. Yagjian's first symptoms of mycosis fungoides predated his entry into the Army was never raised by Mr. Yagjian or the ABCMR. Rather, it was raised by the Dermatology Consultant in his report at the conclusion of the administrative appeals process, a point at which neither party could present evidence or an argument to the ABCMR. The statements, opinions and affidavits of Mr. Yagjian, the numerous people who knew

him at various times in his life, and the dermatologists who treated him lead ineluctably to the conclusion that Mr. Yagjian developed the disease during the service. Had the ABCMR explicitly found that this evidence was not worthy of belief, perhaps its determination could stand. This Court holds that not having made such a finding, the ABCMR's decision runs counter to the evidence presented, "is so implausible that it could not be ascribed to a difference in view or the product of agency expertise[,]" *Motor Vehicle Mfrs. Ass'n. v. State Farm,* —— U.S. at ——, 103 S.Ct. at 2867, and is therefore arbitrary, capricious, and not based on substantial evidence.

■ The Defendants have argued in the alternative that John Yagjian's complaint fails to state a claim upon which relief can be granted because he is in reality seeking judicial review of the Veteran's Administration's denial of disability compensation. 38 U.S.C. § 211(a) embodies a Congressional mandate prohibiting judicial review of decisions of the Veteran's Administration. It provides, in pertinent part:

> "the decisions of the Administrator on any question of law or fact under any law administered by the Veteran's Administration providing benefits and their dependents or survivors shall be final and conclusive and no other official or any court of the United States shall have power or jurisdiction to review any such decision by any action in the nature of mandamus or otherwise.

38 U.S.C. § 211(a) (1976).

As Defendants have pointed out, case law is uniform in holding that this statute is constitutional, and permits of no exception. It does not, however, operate to bar a veteran from trying to correct his military record if he believes it to be erroneous. John Yagjian is not, by this action, seeking judicial review of the Veteran's Administration's previous decision in his case. That decision was based on a military medical record that was silent with regard to any skin rash during the service. If Mr. Yagjian's military record is changed to reflect the inception of mycosis fungoides during

the service, a completely new and different issue would be before the V.A.

■ Defendants have also asserted that Mr. Yagjian's complaint is time-barred pursuant to 28 U.S.C. § 2401(a), which provides that civil actions against the United States must be commenced within six years after the cause of action first accrues. Defendants contend that Mr. Yagjian's cause of action arose at the time of his discharge in 1945.

In *Mulvaney v. Stetson,* 470 F.Supp. 725 (N.D.Ill.1979), the court found that a cause of action for review of an unfavorable decision by the Air Force Board for the Correction of Military Records accrued on the date of the Correction Board's decision, not when the plaintiff was discharged. *Id.* at 729. The court noted that "[t]his rationale helps to explain the many decisions in which courts have entertained corrective actions which would have been time barred if the cause accrued as of the date of discharge." *Id.* at 729–30. The court also pointed out that 10 U.S.C. § 1552, the statute which empowers secretaries of military departments to correct military records when it is necessary to correct an error or remove an injustice, enables the Correction Board to deny an applicant relief if his claim is not timely. Section 1552(b) provides that "[n]o correction may be made ... unless the claimant ... files a request therefore ... within three years after he discovers the error or injustice, .... However, a board ... may excuse a failure to file within three years after discovery if it finds it to be in the interest of justice." In Mr. Yagjian's case, the ABCMR itself could have determined that his delay was inexcusable and that the interest of justice did not require consideration of his request. It did not make that determination, however, and this Court will not now do so. As the *Mulvaney* court stated,

> "Because Congress has given the Correction Board the power to excuse an untimely filing and consider the merits of a plaintiff's claims, the district court's power to review the Board's decision on the merits should be the same regardless of

whether the plaintiff filed his correction request within three years of discharge." 470 F.Supp. at 730.

This reasoning applies with equal force to the Defendants' argument that Mr. Yagjian's complaint should be dismissed under the doctrine of laches. Laches requires proof of undue delay by the plaintiff and prejudice to the defendant. The Court in *Kaiser v. Secretary of the Navy,* 525 F.Supp. 1226 (D.Colo.1981), was faced with the same argument and held that "when the defendant correction board decided to review the plaintiff's action, filed far beyond the three year limit, it implicitly determined that the 'interest of justice' outweighed any governmental prejudice. Further, by voluntarily excusing the plaintiff's untimely filing and reviewing his petition, the defendants waived any previous right they may have had to assert the equitable defense of laches." *Id.* at 1230.

Defendants cite *Brewster v. Secretary of the United States Army,* 489 F.Supp. 85 (E.D.N.Y.1980), in support of their position. In that case, the plaintiff sought back pay, retroactive promotions, the expungement of a general court-martial from his military record, and damages. The court dismissed the action as barred by the statute of limitations, basing its decision on the rule that "a claim arising from an allegedly illegal discharge from military service accrues at the time of discharge." *Id.* at 87.

The *Kaiser* court refused to dismiss the plaintiff's action for judicial review of a decision by the Board of Correction of Naval Records on the basis of the § 2401(a) limitations period. 525 F.Supp. at 1230. The court engaged in a rather extensive analysis of the application of § 2401(a) to military discharge cases in which plaintiffs seek various forms of relief, including correction of their military records. The statute has not been uniformly applied in these cases, and the court stated in a footnote that the only case it was aware of which had dismissed a corrective action as barred by the statute of limitations was *Brewster. Id.* at 1228 n. 4.

This Court declines to follow the reasoning of the *Brewster* court, but rather adopts that of the *Stetson* and *Kaiser* courts.

Accordingly, Defendants' Motion to Dismiss, or in the Alternative, for Summary Judgment, is denied. Defendants are hereby directed to correct John Yagjian's discharge physical report to reflect the inception of mycosis fungoides in 1944, while he was in the service.