Martin H. JOHNSON, Plaintiff,

v.

The **UNITED STATES**, Defendant.

No. 09–620C.

United States Court of Federal Claims.

July 16, 2010.

Martin H. Johnson, Henderson, Nevada, appearing pro se.

Eric P. Bruskin, with whom were Tony West, Assistant Attorney General, Jeanne E. Davidson, Director, and Martin F. Hockey, Jr., Assistant Director, United States Department of Justice, Civil Division, Commercial Litigation Branch, Washington, D.C., for Defendant.

## OPINION AND ORDER

WHEELER, Judge.

Before the Court are Defendant's December 17, 2009 motion for judgment on the administrative record ("Def.'s Mot.") and pro se Plaintiff's January 12, 2010 cross-motion for judgment on the administrative record ("Pl.'s Mot."), filed pursuant to Rule 52.1(c) of the Rules of the Court of Federal Claims ("RCFC"). Plaintiff Martin H. Johnson served on active duty in the United States Navy ("Navy") from 1975 until his voluntary separation in 1993, two years before he would have qualified for permanent retirement and disability benefits. In December 1990, a military psychologist diagnosed Mr. Johnson with "Adjustment Disorder."[1] Mr.

---

1. The definitive source on the classification of mental disorders describes the essential feature of adjustment disorder as "a maladaptive reaction to an identifiable psycho-social stressor, or stressors, that occurs within three months after onset of the stressor, and has persisted for no longer than six months." Am. Psychiatric Ass'n, *Diagnostic Statistical Manual of Mental Disorders* (*"DSM–III–R"*) 329 (3d ed.1987) (the edition of the Manual relevant at the time of Mr. Johnson's

Johnson contends that the Navy improperly discharged him from active duty because it misdiagnosed his mental disorder.

In May 2005, Mr. Johnson filed an application with the Board for Correction of Naval Records ("BCNR") to modify his separation and correct his military record to reflect a permanent disability retirement. In his filing, Mr. Johnson alleged the following: (1) a military psychologist misdiagnosed him with Adjustment Disorder in 1991, when he truly suffered from Bipolar II Disorder; (2) the misdiagnosis inhibited his eligibility for permanent disability retirement; and (3) his ineligibility for permanent disability retirement affected his judgment in voluntarily separating from the Navy. *See* Administrative Record ("AR") 211. The BCNR denied Mr. Johnson's application on August 11, 2006, "substantially concurr[ing]" with an advisory opinion it had requested from the National Naval Medical Center ("NNMC"), Behavior Healthcare Clinic, on March 1, 2006. *Id.* at 120–21,188. On April 6, 2007, Mr. Johnson petitioned the BCNR to reconsider its initial decision. *Id.* at 16–18. The BCNR denied his petition on August 1, 2007, citing an absence of "new material evidence." *Id.* at 2.

Mr. Johnson filed suit in this Court on September 22, 2009. (Compl.1–2.) On December 17, 2009, Defendant filed a motion for judgment on the administrative record. (Def.'s Mot. 1.) On January 12, 2010, Mr. Johnson filed his response to Defendant's motion, and his cross-motion for judgment on the administrative record. (Pl.'s Mot. 1.) Defendant replied to Mr. Johnson's cross-motion on February 12, 2010. When Mr. Johnson did not file a reply as permitted by RCFC 7.2, the Court issued an order on May 3, 2010 inviting him to submit a reply by May 17, 2010, but Mr. Johnson declined this invitation.

In his motion for judgment on the administrative record, Mr. Johnson alleges that the BCNR's decision to deny his application for modification and correction of his military record is arbitrary and capricious, unsupported by substantial evidence, and contrary to applicable law. (Pl.'s Mot. 1.) Mr. Johnson also challenges the BCNR's August 1, 2007

decision to deny his petition for reconsideration of its initial decision. *Id.* Mr. Johnson demands: (1) correction of his military records to reflect active duty service through March 17, 1996, which would have been his 20–year anniversary in the Navy; (2) correction of his military records to reflect his transfer to the permanent disability retired list after March 17, 1996; (3) reimbursement for all active duty back-payments and benefits through March 17, 1996; (4) reimbursement for all disability back-payments after March 17, 1996 through the present date; (5) the award of continuing disability payments; and (6) attorneys' fees and costs pursuant to RCFC 54(d). (*See* Compl. 39–40.)

Defendant argues that the BCNR's decision to deny Mr. Johnson's initial application is not arbitrary and capricious, but rather is supported by substantial evidence. (Def.'s Mot. 9–12, 14–15.) Defendant further asserts that the BCNR's decision to deny Mr. Johnson's petition for reconsideration is not arbitrary and capricious, given the BCNR's initial decision and Mr. Johnson's failure to produce "new and material evidence" of wrongdoing. *Id.* at 13.

For the reasons that follow, the Court DENIES the motions of both parties for judgment on the administrative record. The BCNR did properly conclude that Mr. Johnson suffers from Adjustment Disorder. There is insufficient evidence to support Mr. Johnson's assertion that he suffers from a Bipolar II Disorder. Mr. Johnson's Adjustment Disorder, however, does constitute a physical disability sufficient to make him eligible for permanent disability benefits. The BCNR must re-evaluate whether Mr. Johnson's Adjustment Disorder rendered him unfit for military duty such that he is in fact entitled to the claimed benefits. In its denial of Mr. Johnson's application for record correction, the BCNR relies almost exclusively on an NNMC advisory opinion that applied the wrong disability evaluation regulation. The Court, therefore, rejects the BCNR's finding that Mr. Johnson was fit for duty at the time of his separation from the Navy. With no additional explanation for the

separation from the Navy). The stressors may be

single or recurrent. *Id.*

BCNR's finding beyond the cited advisory opinion, this Court cannot affirm the BCNR's decision to deny Mr. Johnson's claimed benefits. Accordingly, the case will be remanded to the BCNR for a proper evaluation of Mr. Johnson's fitness given his physical disability, which is to be supported by reasoned explanation.

### Factual Background

#### A. Mr. Johnson's Tenure with the Navy

Mr. Johnson enlisted in the Navy on December 17, 1975. AR 122, 230. He served as a cryptologic technician within the intelligence field. Id. at 122. By 1987, Mr. Johnson had earned the rank of Chief Petty Officer, "as an early candidate." Id. at 215, 315. He served on active duty until September 3, 1993. Id. at 122, 230. At that time, Mr. Johnson elected not to reenlist and was released from active duty. Id. at 122. He was approximately two years shy of his twentieth anniversary with the Navy, upon which date he would have been eligible to request quasi-retirement status with the Fleet Reserve. Id. at 122; see 10 U.S.C. § 6330(b) (2006). Overall, Mr. Johnson's performance evaluations in the Navy were exemplary. See e.g., id. at 274–75, 277–78, 346–47, 1000–08. He was charged with assault while he was in the service, but he reports that the Navy dropped all charges. Id. at 216, 266.

Mr. Johnson was stationed overseas for most of his eighteen-year career in the Navy. See id. at 215–16, 271, 274, 277. While on a "remote" tour in Iceland from 1983 to 1986, Mr. Johnson first sought mental health treatment for periods of depression and paranoia. (see Pl.'s Mot. 3); Id. at 215. Contemporaneous evaluations of his Icelandic tour indicate a slight downward trend in his job performance during this time. Compare AR 271–72 with AR 274–75, 1004–05. Mr. Johnson, however, has repeatedly denied any nervousness, loss of memory, excessive worry, or depression while serving in Iceland. Id. at 123.

In 1989, while stationed at the Naval Communication Station in Rota, Spain, Mr. Johnson reported that he had suicidal thoughts after arguing with his wife. Id. at 215. That same year, Mr. Johnson denied having ever attempted suicide or having ever received treatment for any mental health conditions while in the Navy. Id. at 122–23. His wife separated from him in 1989 and she returned to the United States from Spain with their son. Id. at 216. The following year, Mr. Johnson accepted orders to do a second "remote" tour with the Joint Task Force Middle East. Id. While stationed in the Middle East, Mr. Johnson recalls he had daily suicidal fantasies. Id. Mr. Johnson later requested transfer to Fort Meade in Maryland to be near his wife and son. Id.

In September 1990, Mr. Johnson reported for duty at Fort Meade, where he was detailed to the National Security Agency ("NSA"). (See Pl.'s Mot. 3.) That same month, he voluntarily sought counseling from the Navy Family Assistance Center ("NFAC") for stress related to his new command, and to his marriage. See AR 334. Mr. Johnson temporarily reconciled with his wife. Id. at 217.

During a counseling session, Mr. Johnson confided to an NFAC social worker that he planned to murder his Department Master Chief, before killing himself. Id. at 42–43, 217, 266. With the approval of Mr. Johnson's Commanding Officer, the NFAC revoked his Sensitive Compartmented Information ("SCI") clearance, and ordered him to report to NSA Psychological Services for a follow-up psychological evaluation. See id. at 217, 334–35. In a December 10, 1990 referral for psychological services, the NFAC's Director observed that Mr. Johnson was experiencing "suicidal thoughts/ideations, self-destructive behaviors, and fear of loss of control." Id. at 334, 335–38.

Pursuant to the NFAC's referral, Mr. Johnson underwent biweekly counseling sessions with a licensed military clinical psychologist from December 1990 through April 1991. Id. at 315–16, 319–33. On April 4, 1991, in the requested follow-up psychological evaluation, a military psychologist diagnosed Mr. Johnson with "Adjustment Disorder with Anxious Mood," and as "[p]aranoid with schizoid personality features." Id. at 124–25, 320. The psychologist, however, concluded that Mr. Johnson was "free from significant psychopathology...." Id. at 320.

His "personality characteristics of a paranoid and schizoid nature" were found to "manifest themselves in interpersonal suspiciousness and distrust, expectations that others are out to exploit or harm him, hypersensitivity, and a sense of entitlement." *Id.* Due to Mr. Johnson's "likelihood of further acting out behavior, unreliability, and tense interpersonal relationships," the psychologist advised that he not regain SCI clearance. *Id.* According to Mr. Johnson, his Commander ignored this recommendation and reinstated his clearance. (Pl.'s Mot. 5.) The psychologist also recommended: "Should further difficulties occur, they should be dealt with through administrative rather than medical channels." AR 320. The psychologist encouraged Mr. Johnson to continue in counseling, but Mr. Johnson declined any further mental health treatment while in the Navy. *See id.* at 222.

Mr. Johnson claims in his application for correction of his record that in 1993, he asked to remain with the NSA at Fort Meade for his final two years before retirement. *See id.* at 223. He states that the Navy denied his request. *Id.* He then elected to separate from the service to start a manufacturing and retail business. *Id.* at 122, 1008. Mr. Johnson's final performance evaluation was positive, noting he was an "excellent communicator," "a proven administrator and manager," "consistently driven by a strong desire for excellence," and "confident and energetic." *Id.* at 1008.

Upon his separation, the Navy performed an extensive physical examination of Mr. Johnson. *Id.* at 122–23. At the time, Mr. Johnson reported "trouble sleeping, depression or excessive worry but denied loss of memory or nervous trouble of any sort." *Id.* at 123. He stated that he had never attempted suicide. *Id.* The report states that Mr. Johnson received counseling secondary to job-related stress and long tours overseas. *Id.* As part of his separation examination, he signed a statement that he would report any "serious defect or condition that interferes or has interfered with performance of [his] military duties. . . ." *Id.* Mr. Johnson reported no mental health issues and stated his health was "good except for occasional kidney pain."

*Id.* He departed with an honorable discharge. *Id.* at 122–23, 214.

### B. *Mr. Johnson's Post–Navy Career*

Mr. Johnson reports that his manufacturing venture failed. (Pl.'s Mot. 5); *see* AR 269. After leaving the Navy, he divorced, filed for bankruptcy, and worked 24 different jobs between September 1993 and February 2004. (Pl.'s Mot. 5–6); *see also* AR 126, 269, 1013. Mr. Johnson currently is unemployed. (Pl.'s Mot. 6.)

At least five mental health professionals from the U.S. Department of Veterans Affairs ("VA"), on at least thirteen different occasions, evaluated Mr. Johnson after his separation from the Navy. AR 125–26, 237–54, 256–63, 1009–19. All confirmed a diagnosis of Adjustment Disorder. *Id.* at 125–26, 237–54, 256–63.

In approximately July 2004, Dr. Dodge A. Slagle, D.O., an osteopathic psychiatrist unaffiliated with the VA, diagnosed Mr. Johnson with Bipolar II Disorder. *Id.* at 127, 265–68. To reach that diagnosis, Dr. Slagle reviewed Mr. Johnson's Navy and post-Navy histories, along with his therapy. (Pl.'s Mot. 6); *see also* AR 265–68. Dr. Slagle was the first mental health professional to diagnose Mr. Johnson with Bipolar II Disorder. *See* AR 265–68. Dr. Slagle advised that Mr. Johnson's bipolar symptoms began while he was still in the Navy. (Pl.'s Mot. 6); *see also* AR 267–68.

Thereafter, on December 17, 2004, a VA psychiatrist, Dr. David B. Crawford, confirmed Dr. Slagle's diagnosis. *See* AR 1017–19. Dr. Crawford observed, "Bipolar II [Disorder] is the most reasonable [diagnosis] at hand." *Id.* at 1018. Yet, Dr. Crawford's report indicates that he is not completely convinced Mr. Johnson suffers from bipolar disorder. *Id.* at 1014 ("I more strongly suspect an anxiety [disorder] rather than bipolar [disorder].").

About six months later, on May 31, 2005, Mr. Johnson sought a Compensation and Pension Examination from another VA psychiatrist, Dr. Joyce M. Oates. *Id.* at 1020–24. Dr. Oates diagnosed Mr. Johnson with "Major Depressive Disorder," which can be

a feature of bipolar disorder. *Id.* at 1024; *see also Diagnostic Statistical Manual of Mental Disorders ("DSM–III–R")* at 225–26. Dr. Oates also diagnosed Mr. Johnson with "Personality Disorder [Not Otherwise Specified]," with "diabetic [characteristics], hypercholesterolemia, [and] sleep apnea," with "[s]tress at level 2, including limited social support group," and with a Global Assessment of Functioning at level 60 due to depression. AR 1024. She derived her findings in part from Mr. Johnson's NSA Psychological Services mental health records, (Pl.'s Mot. 7); *see* AR 1020, and asserted that his symptoms "are a continuation of the symptoms that [Mr. Johnson] had when in the military." AR 1024.

On November 25, 2005, the VA awarded Mr. Johnson an overall disability rating of 40 percent due to "Major depressive disorder," which the VA recognized to be "claimed as neuropsychiatric disorder/depression/bipolar II disorder and previously adjudicated as a history of depression." *Id.* at 192. At present, Mr. Johnson states that he is receiving treatment through the VA, including medication and monthly therapy sessions. (Pl.'s Mot. 6.)

### C. *Mr. Johnson's Application to the BCNR and the NNMC's Advisory Opinion*

Mr. Johnson applied to the BCNR on May 13, 2005, seeking correction of his Navy records. AR 210–12. He alleged: (1) the Navy failed to diagnose him with Bipolar II Disorder prior to his separation; (2) the Navy's failure prevented him from being eligible for permanent disability retirement; and (3) his incorrect belief of ineligibility affected his decision to separate from the Navy. *See id.* at 211. On March 1, 2006, the BCNR asked the NNMC for an advisory opinion concerning the merits of Mr. Johnson's allegations. *Id.* at 188.

The NNMC's psychiatrists, Dr. Nana Dadson and Dr. David K. Weber, authored a thirteen-page report (the "NNMC Opinion"). *Id.* at 122–35. The doctors analyzed Mr. Johnson's medical records, including his April 1991 psychological evaluation, and various reports that Mr. Johnson submitted in support of his application. *See id.* Neither Dr. Dadson nor Dr. Weber evaluated Mr. Johnson in person. *Id.*

The NNMC determined that the military psychologist, who examined Mr. Johnson in 1991, used the appropriate standard of care at that time, the *DSR–III–R,* to diagnose and treat Mr. Johnson for an Adjustment Disorder. *Id.* at 131, 134. The NNMC also found that Mr. Johnson was ineligible for permanent disability retirement, explaining that Mr. Johnson was psychologically evaluated following a threat to kill his commanding officer and found to be "Fit for Full Duty" in April 1991.[2] *Id.* at 132. The Navy notified Mr. Johnson of its fitness finding and he signed and reviewed his treatment record in October 1991.[3] *Id.* Finally, the NNMC concluded that Mr. Johnson's Adjustment Disorder did not affect his judgment in separating from the Navy voluntarily in 1993 because he was found "Fit For Full Duty" and therefore, competent to make decisions. *Id.* at 132–33. On April 19, 2006, the BCNR forwarded a copy of the NNMC's Opinion to Mr. Johnson, and afforded him 30 days to submit any additional statement or documentary material. *Id.* at 164.

Mr. Johnson consulted with Dr. Michael R. Madow on April 26, 2006. *Id.* at 152–55. Dr. Madow concluded that "to a reasonable medical certainty [ ] [Mr. Johnson] is bipolar II disorder, depressed, in partial remission" with "an additional diagnosis of adjustment reaction with depressive features." *Id.* at 154. To reach his opinion, Dr. Madow met with Mr. Johnson and reviewed his medical record. (Pl.'s Mot. 7); *see* AR 152–54. Mr. Johnson submitted Dr. Madow's evaluation to the BCNR on May 12, 2006, along with his response to the NNMC Report. AR 140–54.

---

**2.** The NNMC Opinion states that this follow-up psychological evaluation took place in April 2001. Other information in the record makes clear that the NNMC Opinion is incorrect. The follow-up evaluation to which the Opinion refers took place in April 1991.

**3.** The NNMC Opinion again is incorrect. Mr. Johnson signed the evaluation in October 1991, not in October 2001 as the Opinion provides.

On August 11, 2006, a three-member BCNR panel denied Mr. Johnson's application. *Id.* at 120–21. The panel explained that it "substantially concurred" with the content of the NNMC Report, and had determined that "the evidence submitted was insufficient to establish the existence of probable material error or injustice." *Id.* at 120.

Subsequently, Mr. Johnson solicited an opinion from a forensic psychiatry specialist, Dr. Neil S. Kaye. *Id.* at 35–50. Dr. Kaye prepared a fifteen-page forensic psychiatric evaluation, dated November 1, 2006. *See id.* According to Mr. Johnson, Dr. Kaye serves as a regular court-appointed expert witness in matters concerning Bipolar II Disorder. (Pl.'s Mot. 8.) Dr. Kaye confirmed Mr. Johnson's recent Bipolar II Disorder diagnoses. AR 49–50. He explained, "it is clear that [Mr. Johnson] had manifest the signs and symptoms of [Bipolar II Disorder] for many years, throughout most of his military service, and that his moods had a significant affect on his behavior and performance while enlisted." *Id.* at 46. Dr. Kaye continued, "Mr. Johnson clearly displayed symptoms of major depression while in the [Navy]." *Id.*

With the assistance of counsel, Mr. Johnson petitioned the BCNR to reconsider its decision on April 6, 2007. *Id.* at 16–33. He enclosed Dr. Kaye's evaluation in support of his reconsideration petition. *See id.* at 34–50. The BCNR denied Mr. Johnson's petition on August 1, 2007, citing an absence of "new material evidence or other matter as those terms are defined in Secretary of the Navy Instruction 5420.193 . . . ." *Id.* at 2.

On August 20, 2007, Mr. Johnson mailed a letter to the Secretary of the Navy, asking that he amend the BCNR's initial decision. (Pl.'s Mot. 8); *see also* AR 12. The Navy's Assistant General Counsel for Manpower and Reserve Affairs responded to Mr. Johnson on September 25, 2007, rejecting that request. AR 12.

### Standard of Review

Under the Court's Rules, a motion for judgment on the administrative record is distinguishable from a motion for summary judgment. *Saab Cars USA, Inc. v. United States,* 434 F.3d 1359, 1372 (Fed.Cir.2006) (citing *Bannum, Inc. v. United States,* 404 F.3d 1346, 1353–57 (Fed.Cir.2005)); *see also* RCFC 52.1 Committee Notes ("Summary judgment standards are not pertinent to judicial review upon an administrative record."). The existence of genuine issues of material fact neither precludes this Court from granting judgment on the administrative record nor requires it to conduct evidentiary proceedings. *Fort Carson Support Servs. v. United States,* 71 Fed.Cl. 571, 585 (2006). Rather, this Court resolves such factual questions by referencing the administrative record, as if conducting a trial on the paper record. *Bannum,* 404 F.3d at 1357. The standards and criteria that govern the Court's review of agency decisions will vary depending upon the specific law to be applied in a particular case. *See* RCFC 52.1 Committee Notes.

In the military disability context, it is well-settled that this Court is bound by the decisions of a records correction board absent clearly convincing evidence that the board's decision was (1) arbitrary and capricious; (2) unsupported by substantial evidence; or (3) contrary to applicable law. *See Porter v. United States,* 163 F.3d 1304, 1312 (Fed.Cir.1998); *Rominger v. United States,* 72 Fed.Cl. 268, 272 (2006); *Koretsky v. United States,* 57 Fed.Cl. 154, 158 (2003); *Slesinski v. United States,* 34 Fed.Cl. 159, 163 (1995). This Court presumes that correction boards "fulfill their statutory responsibilities in an admirable way." *Skinner v. United States,* 219 Ct.Cl. 322, 594 F.2d 824, 830 (Ct.Cl.1979). In particular, the Court defers to administrative decisions regarding a service member's fitness for duty. *Bernard v. United States,* 59 Fed.Cl. 497, 500 (2004); *see also Doe v. United States,* 132 F.3d 1430, 1434 (Fed.Cir.1997) ("When a branch of the armed forces has made a decision concerning who is or who is not fit to serve, that decision is generally entitled to great deference."). "It [also] is 'singularly' inappropriate to second-guess the judgment of [ ] military medical officers . . . ." *Slesinski,* 34 Fed.Cl. at 163–64 (quoting *Voge v. United States,* 844 F.2d 776, 780 (Fed.Cir.1988), *cert. denied,* 488 U.S. 941, 109 S.Ct. 365, 102 L.Ed.2d 355 (1988)). Nevertheless, the presumption in favor of upholding correction board decisions is re-

buttable. *Skinner*, 594 F.2d at 830 (internal citations omitted).

The Court will not, however, re-weigh the evidence or sit as a "super correction board." *Id.* at 830. In its review capacity, the Court must determine if a correction board's conclusions are supported by substantial evidence. *Heisig v. United States*, 719 F.2d 1153, 1157 (Fed.Cir.1983).

### Discussion

#### A. The BCNR's Initial Decision Relied upon an Incorrect Advisory Opinion and Offered No Other Explanation

The Court affords great deference to correction board decisions, but "that deference is not absolute." *Rominger*, 72 Fed.Cl. at 273. A correction board must "examine relevant data and articulate a satisfactory explanation for [its] decisions." *See Van Cleave v. United States*, 66 Fed.Cl. 133, 136 (2005) (citing *Yagjian v. Marsh*, 571 F.Supp. 698, 701 (D.N.H.1983)). Correction boards need to articulate "rational connections between the facts found and the choices made." *See Burlington Truck Lines v. United States*, 371 U.S. 156, 168, 83 S.Ct. 239, 9 L.Ed.2d 207 (1962). Where a correction board fails to support its decision with a reasoned explanation of an important issue, a remand is appropriate. *See e.g., Van Cleave*, 66 Fed.Cl. at 138; *Rominger*, 72 Fed.Cl. at 273–74.

In his initial application, Mr. Johnson requested the BCNR to make the following nine corrections: (1) "Find that Applicant suffers from Bipolar II Disorder;" (2) "Find that the Applicant suffered from Bipolar II Disorder while on active duty;" (3) "Find that the Applicant was misdiagnosed by military caregivers;" (4) "Find that the misdiagnosis prevented the Applicant of the opportunity of being rated for a disability;" (5) "Find that the Applicant suffered injustices for seeking mental health care perpetrated on him by members of his Chain of Command while at the Naval Security Group ...;" (6) "Find that Applicant's disorder affected his judgment resulting in an early discharge of Applicant;" (7) "Take corrective action to change Applicant's Expiration of Active Obligated Service (EAOS) ... to reflect 20 years of active duty service;" (8) "Take corrective action to establish a disability rating of at least 50% ...;" and (9) "Take corrective action to ensure Applicant receives all pay, compensation, and benefits associated with his rank, time in service and disability." AR 211. The BCNR's decision to deny Mr. Johnson's application, a one and one-half page letter, fails to respond directly to any of Mr. Johnson's nine correction requests. Instead, the BCNR stated that it "considered the advisory opinion furnished by members of the psychiatry staff of National Naval Medical Center, Bethesda, dated 14 April 2006" and "substantially concurred with the comments contained in the advisory opinion." AR 120. Without offering a detailed explanation for its decision or citing any record evidence, the BCNR concluded that Mr. Johnson "performed [his] duties in a highly satisfactory manner in the years immediately preceding [his] discharge, and that there is no indication in [his] record that [he] was unfit for duty by reason of physical disability at the time of [his] discharge." *Id.*

The advisory NNMC Opinion, upon which the BCNR substantially relied in rejecting Mr. Johnson's application, is fatally flawed. The Opinion cites incorrect regulations and fails to consider a key provision of the correct regulation, which makes clear that Mr. Johnson, at a minimum, is eligible for benefits. Consequently, the Opinion cannot form the basis for the BCNR's decision. Consistent with the correct regulation and this Court's finding that Mr. Johnson is eligible for disability benefits, the BCNR must consider anew Mr. Johnson's fitness at the time of his separation from the military.

In its Opinion, the NNMC made the following conclusions: (1) the Navy correctly diagnosed Mr. Johnson with Adjustment Disorder rather than Bipolar II Disorder; (2) the Navy properly found Mr. Johnson fit for duty, and therefore ineligible for permanent disability retirement; and (3) Mr. Johnson's Adjustment Disorder did not affect his judgment, and therefore he was mentally competent when he voluntarily separated from the Navy. AR 122–133.

■ The Court does find that the NNMC's first conclusion, that Mr. Johnson suffers from Adjustment Disorder, is reasonable in light of his medical history. Dr. Slagle diagnosed Mr. Johnson with Bipolar II Disorder in 2004, eleven years after he had separated from the Navy. Prior to Dr. Slagle's diagnosis, every doctor who treated Mr. Johnson concurred with the 1991 Navy psychologist's diagnosis of Adjustment Disorder. *See* AR at 127, 265–68. Mr. Johnson's consistent diagnosis of Adjustment Disorder for more than a decade is substantial evidence that he was afflicted with Adjustment Disorder, not Bipolar II Disorder, at the time he separated from the Navy.

Nevertheless, to reach its second and third conclusions, the NNMC applied incorrect versions of the Navy's disability evaluation regulations. The application of the proper statutory provisions in fact could alter significantly the NNMC's conclusions, and in turn the BCNR's decision. Therefore, on remand to analyze Mr. Johnson's claims, the BCNR is directed to apply the correct regulatory provisions as outlined below and to disregard the provisions that the NNMC improperly cited.

The NNMC analyzed Mr. Johnson's initial application for modification of his record under Secretary of the Navy Instructions ("SECNAVINST") 1850.4D and 1850.4E. However, as Defendant concedes, SECNAVINST 1850.4C was in effect between March 8, 1990 and December 22, 1998 and therefore, is the regulation applicable to Mr. Johnson's 1993 separation. (Def.'s Mot. 10–11 n. 2.) The provisions of SECNAVINST 1850.4D and E are largely similar to the provisions of SECNAVINST 1850.4C, but a key change in the Navy's treatment of Adjustment Disorder could determine the outcome in this case.

In its Opinion, the NNMC cited to SEC-NAVINST 1850.4D § 3301 "Standard Used For Disability Determination" concerning whether a physical disability causes a service member to become unfit for duty. That section's SECNAVINST 1850.4C analogue, § 2050, assesses the same criteria: "unfitness to perform the duties of office, grade, rank or rating because of disease or injury incurred or aggravated while entitled to basic pay." *Compare* 1850.4D § 3301 *with* 1850.4C § 2050. The NNMC also cited to SECNAVINST 1850.4D § 3305 "Presumption of Fitness" concerning the continued performance of duty in spite of disease or injury. That section's SECNAVINST 1850.4C analogue, § 2056, contains largely similar provisions. *Compare* 1850.4D § 3305 *with* 1850.4C § 2056. Lastly, the NNMC cited to SECNAVINST 1850.4E § 3414 "Presumption of Mental Competence," which is identical to its SECNAVINST 1850.4C § 2090 predecessor. *Compare* 1850.4E § 3414(a) *with* 1850.4C § 2090.

Still, the NNMC failed to cite a provision essential to the assessment of Mr. Johnson's eligibility at the time of his departure—SEC-NAVINST 1850.4C, Enclosure 3 § O(3)(a). Indeed, the NNMC did not even cite the successor to this key provision, SECNA-VINST 1850.4D § 8013(a)(4). A comparison between SECNAVINST 1850.4C, Enclosure 3 § O(3)(a) and the revised SECNAVINST 1850.4D § 8013(a)(4) reveals that Mr. Johnson is eligible for disability benefits. SEC-NAVINST 1850.4C, Enclosure 3 § O(3)(a), the provision applicable to Mr. Johnson that the NNMC neglected to reference, states: "*Personality disorders* are considered to render an individual administratively unfit rather than unfit because of physical disability. Interference with performance of effective duty will be dealt with through appropriate administrative channels." (emphasis added). In contrast, the later 1850.4D § 8013(a)(4) provides: "Personality, Sexual ... *Adjustment Disorders* ... or Learning Disabilities are conditions that may render an individual administratively unable to perform duties rather than medically unable ... These conditions *do not constitute a physical disability* ...." (emphasis added).

There is a subtle yet important distinction between the two provisions. Under SECNA-VINST 1850.4D § 8013(a)(4), Mr. Johnson's "Adjustment Disorder" is not a physical disability qualifying him from benefits. However, under the provision relevant to Mr. Johnson, SECNAVINST 1850.4C, Enclosure 3 § O(3)(a), only a "personality disorder" is found not to constitute a physical disability. Adjustment Disorder is not a personality dis-

order. *Compare DSM–III–R* at 329–31 ("Adjustment Disorders") *with DSM–III–R* at 335–58 ("Personality Disorders").[4] Indeed, it appears that the Secretary of the Navy in fact updated the text of SECNAVINST 1850.4D to encompass Adjustment Disorders because 1850.4C did not encompass the condition. Applying the proper regulatory provision, SECNAVINST 1850.4C, Enclosure 3 § O(3)(a), it is clear that Mr. Johnson's Adjustment Disorder is a physical disability that could have interfered with the performance of his duties. Accordingly, under SECNAVINST 1850.4C, Mr. Johnson could be eligible for permanent disability retirement.

**B.** *The BCNR Must Determine Whether Mr. Johnson was Unfit for Duty as a Result of his Adjustment Disorder Under SECNAVINST 1850.4C*

█ Although the Court finds Mr. Johnson has a physical disability, "the mere presence of a physical disability does not, in itself, require a finding of *unfit for duty*." SECNAVINST 1850.C § 2054. "It is necessary to correlate the nature and degree of functional impairment produced by physical disability with the requirements of the duties to which the member may reasonably expect to be assigned by virtue of his or her office, grade, rank or rating." *Id.* This Court cannot, however, determine whether Mr. Johnson's Adjustment Disorder rendered him unfit to serve in the Navy at the time of his departure and therefore entitles him to receive permanent disability retirement. *See Slesinski*, 34 Fed.Cl. at 163 (quoting *Heisig v. United States*, 719 F.2d 1153, 1156 (Fed. Cir.1983) ("[R]esponsibility for determining who is fit or unfit to serve in the armed services is not a judicial province ... courts cannot substitute their judgment for that of the military departments when reasonable minds could reach differing conclusions on the same evidence.")). The BCNR must make this determination. Instead of relying on the NNMC Opinion, which improperly evaluated Mr. Johnson's fitness under SECNAVINST 1850.4D, the BCNR should assess Mr. Johnson's fitness under the criteria set forth in SECNAVINST 1850.4C. While these two regulations do contain similar fitness criteria, the BCNR is obligated to determine Mr. Johnson's fitness under the regulation applicable at the time of his 1993 departure.

Notably, the purpose of Navy disability retirement benefits varies from the purpose of VA disability retirement benefits. *Compare* 10 U.S.C. § 1201 (2006); SECNAVINST 1850.4C § 2050 *with* 38 U.S.C. § 1155 (2006); 38 C.F.R. § 4.1 (2009). Mr. Johnson's 40 percent VA disability-rating is therefore not determinative of his unfitness for duty under 10 U.S.C. § 1201 or 1850.4C § 2050. *See Lord v. United States*, 2 Cl.Ct. 749, 754 (1983). The Court's finding that Mr. Johnson's Adjustment Disorder is a physical disability that makes him eligible for benefits demands a new, separate fitness analysis by the BCNR under the test set forth in SECNAVINST 1850.4C. The BCNR should provide reasoned support for its fitness finding. *See Van Cleave*, 66 Fed.Cl. at 136; *see also Rominger* 72 Fed.Cl. at 273. A brief letter referencing only an error-filled NNMC advisory opinion such as is now before this Court will not be considered sufficient to support such an important finding.

*Conclusion*

The BCNR relied upon the faulty conclusions of the NNMC to deny Mr. Johnson's application. Based upon the foregoing, Defendant's motion for judgment on the administrative record is DENIED, and Plaintiff's cross-motion for judgment on the administrative record is DENIED. The matter is RE-

---

4. "[W]hen personality traits are inflexible and maladaptive and cause either significant functional impairment or subjective distress ... they constitute *Personality Disorders*." *DSM–III–R* at 335 (emphasis in original). According to the *DSM–III–R*, a person is diagnosed with a personality disorder may also be diagnosed with an adjustment disorder if "new symptoms appear in response to a stressor." *Id.* at 330. However, a person with adjustment disorder does not necessarily also suffer from a personality disorder. *See id.* Nothing in the record indicates that Mr. Johnson ever received a personality disorder diagnosis in addition to his adjustment disorder diagnosis. "[W]hen personality traits are inflexible and maladaptive and cause either significant functional impairment or subjective distress ... they constitute *Personality Disorders*." *DSM–III–R* at 335 (emphasis in original).

MANDED to the BCNR for a period of 90 days for further proceedings consistent with this opinion.

IT IS SO ORDERED.